1

2  **BOYAMIAN LAW, INC.**
   Michael H. Boyamian, SBN 256107
3     michael@boyamianlaw.com
   Armand R. Kizirian, SBN 293992
4     armand@boyamianlaw.com
   550 North Brand Boulevard, Suite 1500
5  Glendale, California 91203
   Telephone:   (818) 547-5300
6  Facsimile:    (818) 547-5678

7  Attorneys for Plaintiff MAYNOR MEJIA, and all
   others similarly situated
8
                    **UNITED STATES DISTRICT COURT**
9
                    **NORTHERN DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| 11  MAYNOR MEJIA, an individual; Individually and on Behalf of All Similarly Situated Individuals,<br><br>12<br><br>13                    Plaintiff,<br><br>14          v.<br><br>15  XPO LAST MILE, INC., A Georgia Corporation; and DOES 1 through 25, Inclusive,<br>16<br>17                    Defendants. | **Case No.** 3:22-CV-08976-SI<br><br>**CLASS ACTION**<br><br>1. FAILURE TO PAY MINIMUM WAGE;<br>2. FAILURE TO PAY OVERTIME COMPENSATION;<br>3. REIMBURSEMENT OF EMPLOYMENT EXPENSES;<br>4. UNLAWFUL DEDUCTION FROM WAGES;<br>5. FAILURE TO PROVIDE MEAL PERIODS;<br>6. FAILURE TO AUTHORIZE AND PERMIT REST PERIODS;<br>7. FAILURE TO FURNISH ACCURATE WAGE STATEMENTS;<br>8. WAITING TIME PENALTIES;<br>9. UNFAIR COMPETITION; and<br>10. PRIVATE ATTORNEYS GENERAL ACT OF 2004<br><br>**JURY TRIAL DEMANDED** |

18

19

20

21

22

23

24

25

26

27

28

BOYAMIAN LAW,
INC.
550 N. BRAND BLVD.,
STE 1500
GLENDALE, CA 91203

FIRST AMENDED COMPLAINT
Case No. 3:22-CV-08976-SI

1    Plaintiff MAYNOR MEJIA ("Plaintiff"), individually and on behalf of all similarly situated

2    individuals, allege as follows:

3    **GENERAL ALLEGATIONS**

4    1.   This is a proposed class action brought against Defendant XPO LAST MILE, INC.

5    and DOES 1 through 25, inclusive (collectively, "Defendants" or "XPO"), on behalf of Plaintiff and

6    all other non-employee workers who worked in California as a Contract Carrier, Driver, and/or

7    Helper (hereinafter collectively referred to as "Delivery Drivers") for Defendants at any time during

8    the four years preceding April 29, 2018[1], and continuing while this action is pending ("Class

9    Period"), who were denied the benefits and protections required under the California Labor Code

10   and other statutes and regulations applicable to California employees.

11   2.   During the Class Period, Defendants:

12       a.    unlawfully misclassified Delivery Drivers as independent contractors;

13       b.    failed to pay wages for all hours worked by Delivery Drivers;

14       c.    failed to pay Delivery Drivers the applicable legal minimum wage;

15       d.    failed to pay overtime wages due to Delivery Drivers;

16       e.    failed to provide meal and rest periods due to Delivery Drivers;

17       f.    failed to provide the Delivery Drivers with timely and accurate wage and hour

18             statements;

19       g.    failed to pay the Delivery Drivers compensation in a timely manner upon their

20             termination or resignation;

21       h.    failed to maintain complete and accurate payroll records for the Delivery Drivers;

22       i.    wrongfully withheld wages and compensation due to the Delivery Drivers; and

23       j.    committed unfair business practices in an effort to increase profits and to gain an

24             unfair business advantage at the expense of the Delivery Drivers and the public.

25   ////

26

27   _____

28   [1] Pursuant to California Emergency Rule of Court 9, the statute of limitations for this matter was
     tolled beginning on April 6, 2020 and continued to October 1, 2020, for a period of 178 days.

BOYAMIAN LAW,
INC.
550 N. BRAND
BLVD., STE 1500
GLENDALE, CA
91203

-1-
FIRST AMENDED COMPLAINT
Case No. 3:22-CV-08976-SI

3.   The foregoing acts and other acts by Defendants – committed throughout California and Alameda County – violated provisions of the California Labor Code, including sections 201, 202, 203, 204, 210, 216, 221, 223, 225.5, 226, 226.7, 226.8, 246, 510, 511, 512, 515, 551, 552, 558, 1194, 1198, and 2802 (collectively, "Employment Laws"), violated the applicable Wage Orders issued by California's Industrial Welfare Commission, including Wage Orders 9-2001 during the Class Period ("Regulations"), violated California's Unfair Business Practices Act, California Business & Professions Code sections 17200 *et seq*., and violated Plaintiff's rights.

## JURISDICTION AND VENUE

4.   Venue is proper in this Judicial District and the County of Alameda because work was performed by Plaintiff and other members of the Class for Defendants in the County of Alameda, California, and Defendants' obligations under the Employment Laws and Regulations to pay overtime wages, to provide meal and rest periods and accurate wage statements to Plaintiff and other members of the Class arose and were breached in California, including the County of Alameda.

5.   The California Superior Court has jurisdiction in this matter because Plaintiff is a resident of California, and Defendants are corporations qualified to do business in California and regularly conduct business in California.  Further, no federal question is at issue as the claims are based solely on California law.

## THE PARTIES

6.   Plaintiff MAYNOR MEJIA is, and at all relevant times was, a competent adult residing in California.  MAYNOR MEJIA brings suit on behalf of himself and all similarly situated individuals pursuant California Code of Civil Procedure section 382, and California Business & Professions Code sections 17200, *et seq*.  MAYNOR MEJIA was unlawfully classified by Defendant XPO Last Mile, Inc. as an independent contractor and worked as a Contract Carrier and Driver out of the warehouse owned and operated by XPO in Union City, California.

7.   Defendant XPO LAST MILE, INC. is, and at all relevant times was, a Georgia corporation registered with the State of California's Secretary of State. XPO provides logistics and delivery services to its retail merchants like Samsung, Peloton, Macy's and others, to deliver

BOYAMIAN LAW,
INC.
550 N. BRAND
BLVD., STE 1500
GLENDALE, CA
91203

-2-

FIRST AMENDED COMPLAINT

Case No. 3:22-CV-08976-SI

1    product and services to the XPO's customers.  XPO utilizes Delivery Drivers to pick up the

2    merchandise at the merchants' stores or warehouses and to deliver and install them at the

3    customers' homes or businesses.  XPO is therefore a provider of managed transportation services

4    including the planning and execution for "last mile" delivery of its retail merchant clients.  XPO has

5    engaged in unlawful employment practices addressed in this Complaint throughout California and

6    in Alameda County.

7        8.   Plaintiff is informed and believes and based thereon alleges that Defendants uniformly

8    apply their pay practices, and overtime policies to all Drivers and Driver Assistants also known as

9    Helpers. Plaintiff is currently unaware of the true names and capacities of the defendants sued in

10   this action by the fictitious names DOES 1 through 25, inclusive, and therefore sue those

11   defendants by such fictitious names.

12       9.   Plaintiff will amend this Complaint to allege the true names and capacities of such

13   fictitiously named defendants when they are ascertained.

14       10. Plaintiff is informed and believes and based thereon alleges that each defendant sued in this

15   action, including each defendant sued by the fictitious names DOES 1 through 25, inclusive, is

16   responsible in some manner for the occurrences, controversies and damages alleged below.

17       11. Plaintiff is informed and believes and based thereon alleges that DOES 1 through 25,

18   inclusive were the agents, servants and/or employees of Defendants and, in doing the things

19   hereinafter alleged and at all times, were acting within the scope of their authority as such agents,

20   servants and employees, and with the permission and consent of Defendants.

21       12. Plaintiff is informed and believes and based thereon alleges that Defendants ratified,

22   authorized, and consented to each and all of the acts and conduct of each other as alleged herein.

23       13. Plaintiff is informed and believes and based thereon alleges that Defendants, and each of

24   them, were their employer under California law, that Defendants did acts consistent with the

25   existence of an employer-employee relationship with Plaintiff despite their unlawful classification

26   of Plaintiff as independent contractor.

27   ////

28   ////

BOYAMIAN LAW,
INC.
550 N. BRAND
BLVD., STE 1500
GLENDALE, CA
91203

-3-
FIRST AMENDED COMPLAINT
Case No. 3:22-CV-08976-SI

## FACTS COMMON TO ALL CAUSES OF ACTION

14. Defendants unlawfully classified Plaintiff and other similarly situated individuals as independent contractors when, in fact, they were heavily regulated through a series of work-related restrictions and directives through Defendants.  XPO exercises pervasive control over the work these Delivery Drivers perform, such that its designation of the putative class as "independent contractors" is a sham designation.

15. Specifically, XPO secures truck owners and contracts with such truck owners for purposes of delivering, installing, and picking up of merchandise and products to XPO'S clients' customers.  These truck owners go to the warehouses of XPO's clients and go through a hiring process with XPO's employees who are officed at the same site.  Truck owners are hired by XPO. Truck owners then bring on drivers and driver assistants who are also evaluated by XPO for hiring purposes.  Delivery Drivers provide "last mile" delivery, installation, and haul away services. These services are integral and essential to XPO's core business.

16. XPO has established an elaborate system and scheme in an attempt to conceal its true status as the employer of its Delivery Drivers. XPO enters into written agreements with Delivery Drivers, specifically with Contract Carriers, which provide that the Delivery Drivers are independent contractors. XPO's Delivery Service Agreement ("DSA") with Delivery Drivers requires that Delivery Drivers subject themselves to a background check and drug and alcohol test, and that XPO reserves the right to require both pre-engagement and post-engagement alcohol and drug tests of all its Contract Carriers. The agreements are pre-printed contracts of adhesion that are drafted exclusively by XPO and/or on its behalf by its agents. The terms of the agreements are non-negotiable. Through this agreement, XPO reserves and actually exercises the right to control the manner and means by which the Delivery Drivers perform their duties for XPO.

17. Under the DSA, cloaked in the form of "agreement," the driver is engaged to perform work for XPO as a delivery truck driver and XPO controls the manner in which that work is performed in virtually every way. The XPO also requires the driver to "agree" to pay numerous expenses incident to the employment, and to assume various risks that ordinarily and by law are the responsibility of an employer.

BOYAMIAN LAW,
INC.
550 N. BRAND
BLVD., STE 1500
GLENDALE, CA
91203

-4-

FIRST AMENDED COMPLAINT

Case No. 3:22-CV-08976-SI

18. In addition to the DSA, XPO also requires each Contract Carrier to create his or her own "corporation" or "limited liability company." XPO refers its Delivery Drivers to a company that processes the paperwork to create a purported corporate or limited liability company entity for each Contract Carrier, and requires the Contract Carrier to go through this process. In fact, these business entities are nothing more than fictitious business names for the Contract Carrier themselves, and serve no purpose other than to perpetuate and to shield XPO's scheme of mischaracterizing its employees as independent contractors. In the case of Plaintiff, he was required to form "ABC Logistics LLC" for purposes of securing work from XPO on terms favorable to XPO but to the detriment of Plaintiff and other Delivery Drivers by virtue of their misclassification as independent contractors. A true and correct copy of the purported "agreement" XPO and Plaintiff entered into is attached hereto as **Exhibit "1"**.

19. XPO has a series of directives that Delivery Drivers must abide by despite the fact that XPO unlawfully classifies them as independent contractors. XPO reserves the right to determine the locations where the Delivery Drivers pick up and drop off the merchandise assigned to them; the time of day when they must report to work; and the order and timing of their deliveries. XPO provides each Delivery Driver a daily manifest of work assignments that includes the delivery address, the "service window" time when the delivery must be made, and whether the Delivery Driver is required to call the customer 30 minutes ahead of arrival to give notice of when he will make the delivery. The Delivery Drivers must complete all of the work assigned to them and are not allowed to refuse assignments. XPO reserves the right to control the Delivery Drivers' physical appearance, including requiring them to wear XPO uniforms. XPO also reserves the right to require the Delivery Drivers to know and follow XPO'S customer service standards in performing their work, and conduct surveys to determine whether customers are satisfied with the Delivery Drivers' work.

20. XPO further reserves the right to require the Delivery Drivers to follow certain work methods related to, for example, how to move and install the appliances and how to interact with customers. XPO determines the year, branding, and other specifications of the vehicles that the Delivery Drivers use to perform their work. XPO prescribes how the Delivery Drivers document

BOYAMIAN LAW,
INC.
550 N. BRAND
BLVD., STE 1500
GLENDALE, CA
91203

-5-
FIRST AMENDED COMPLAINT
Case No. 3:22-CV-08976-SI

their work and require the Delivery Drivers to contact XPO upon arrival at each stop and then again after the delivery is completed.  XPO also reserves the right to require the Delivery Drivers to call each customer 30 minutes before making the delivery to let the customers know they are on their way.  XPO employs a variety of managerial and supervisory employees who instruct the Delivery Drivers on their job performance and their delivery assignments. The Delivery Drivers interact with XPO'S personnel on a daily basis. XPO'S managerial and supervisory employees also hold regular in-person and/or telephonic meetings where the Delivery Drivers' attendance is mandatory.

21. The Delivery Drivers are paid each week by XPO a flat amount for each delivery, or for each day or week of work, in amounts that are unilaterally determined by XPO.  XPO makes deductions from the Delivery Drivers' pay for reasons including customer complaints, late deliveries, and damaged items and property. This "flat rate" constitutes an unlawful piece-rate compensation system because Delivery Drivers had no control over how many hours they worked and could do nothing to change the amount of pay through their own efficiencies.

22. Upon information and belief, XPO requires the Delivery Drivers to purchase multiple forms of insurance coverage in amounts determined by XPO through insurance plans specified and sometimes negotiated by XPO, and to name XPO and its clients as additional "insureds." XPO further requires the Delivery Drivers to purchase or rent from XPO'S clients, certain tools and equipment.

23. XPO directs Delivery Drivers to engage helpers to deliver the assigned merchandise. XPO prohibits the Delivery Drivers from working with helpers who have not been screened, qualified, and approved in advance by XPO.  XPO expects helpers to follow the same work methods and standards it requires the Delivery Drivers to follow and to comply with all other requirements communicated by XPO, including attendance at meetings held by XPO management and/or its clients.

24. XPO permits Delivery Drivers to engage other Drivers and/or Helpers at their own expense who have been screened, qualified, and approved by XPO.  Delivery Drivers may engage such Drivers and/or Helpers so that they are able to take a day off from work, such as for example when they are unable to come to work due to illness or so that they may have a day of rest. XPO

BOYAMIAN LAW,
INC.
550 N. BRAND
BLVD., STE 1500
GLENDALE, CA
91203

-6-
FIRST AMENDED COMPLAINT
Case No. 3:22-CV-08976-SI

1  expects Drivers and/or Helpers to follow the same work methods and standards it requires the
2  Delivery Drivers to follow and to comply with all other requirements communicated by XPO,
3  including following instructions given by XPO managers and attending mandatory meetings.

4      25. The Delivery Drivers are economically dependent for their financial livelihood on
5  XPO, and XPO is entirely dependent on the Delivery Drivers for the retail merchandise delivery
6  service provided by XPO to its clients. The Delivery Drivers are terminable at will. They may be
7  terminated upon fifteen- or thirty-days written notice without cause or immediately for alleged
8  breaches of the broadly-worded standards and obligations described in the agreement, or arbitrarily.

9      26. Most of the Delivery Drivers have worked, or did work, for XPO for several years.  Despite
10  XPO'S pervasive control over all aspects of its delivery service operation, including the details of
11  the Delivery Drivers' work, XPO has classified and treated the Delivery Drivers as "independent
12  contractors." XPO'S classification and treatment of the Delivery Drivers as "independent
13  contractors" rather than as "employees" is and during all relevant times has been unlawful.

14                              **CLASS ACTION ALLEGATIONS**

15      27. Plaintiff brings these claims as a class action pursuant to Code of Civil Procedure § 382 and
16  Business and Professions Code §§ 17203 & 17204.  Plaintiff brings this action on Plaintiff's own
17  behalf and on behalf of the following class of individuals (the "Class" or "Class Members"):

18          All persons who are or have picked up and delivered products as a driver or
19          helper at the warehouse affiliated with Defendants located in Union City in the
20          State of California during the period commencing from April 29, 2018 and
21          continuing while this action is pending, or who hold a Delivery Service
22          Agreement with XPO Last Mile, Inc., or any related entity, concerning the pick-
23          up or delivery of products from said warehouse during said time period.

24      28. All Delivery Drivers, i.e., Contract Carriers, Drivers, and Helpers, including
25  Plaintiff are putative class members.

26  ////
27  ////
28  ////

BOYAMIAN LAW,
INC.
550 N. BRAND
BLVD., STE 1500
GLENDALE, CA
91203

                              -7-

29. During the Class Period, by virtue of unlawfully classifying Plaintiff and Class Members as independent contractors and compensating Class Members with a "flat rate" Defendants have routinely failed to compensate Delivery Drivers all of the wages they are due ("off-the-clock" work).

30. During the Class Period, Plaintiff and Delivery Drivers were subject to Defendants' unlawful company practice of classifying them as independent contractors and paying them a daily flat sum of money when in fact they were subjected to the pervasive control of Defendants. All who were subject to this unlawful classification and compensation scheme suffered damages. Defendants applied this illegal wage device uniformly to all Delivery Drivers to the disadvantage of Class Members.

31. As a result, during the Class Period, Defendants have failed to provide Drivers and Helpers with accurate wage and hour statements since the daily "flat rate" did not fully compensate Delivery Drivers for all hours worked. Defendants have failed to provide Delivery Drivers with accurate wage and hour statements since the gross hours earned, total hours worked, all deductions made, net wages earned, and all applicable hourly rates in effect during each pay period and the corresponding number of hours worked at each hourly rate.

32. During the Class Period, Plaintiff and Delivery Drivers have been required to work more than eight hours per day and more than forty hours per workweek. Defendants have routinely failed to compensate Delivery Drivers all of the overtime wages they are due.

33. During the Class Period, Defendants have failed to pay accrued wages and other compensation due immediately to Delivery Drivers who were terminated, and Defendants have failed to pay accrued wages and other compensation due within seventy-two hours to Delivery Drivers who ended their employment.

34. The proposed class is ascertainable in that its members can be identified using information contained in Defendants' payroll and personnel records.

////

////

////

BOYAMIAN LAW,
INC.
550 N. BRAND
BLVD., STE 1500
GLENDALE, CA
91203

-8-
FIRST AMENDED COMPLAINT
Case No. 3:22-CV-08976-SI

1    35. <u>Numerosity</u>.  The Delivery Drivers are so numerous, conservatively estimated

2  to include over 40 Delivery Drivers, that joinder of each individual Class Member would be

3  impracticable, and the disposition of their claims in a class action, rather than numerous individual

4  actions, will benefit the parties, the Court and the interests of justice.

5    36. <u>Commonality</u>.  There is a well-defined community of interest in the questions of

6  law and fact involved in this action because Defendants' failure to pay Delivery Drivers their wages

7  or afford them the protections required under the Employment Laws and Regulations affects all

8  Class Members.  Common questions of law and fact predominate over questions that affect only

9  individual Delivery Drivers, because all Delivery Drivers were subject to the uniform, unlawful pay

10  practices and policies. The predominate questions of law and fact include, but are not limited to:

11              a.    Whether Defendants devised a scheme and/or plan to circumvent California

12                   wage and hour laws;

13              b.    Whether Defendants' conduct was fraudulent and/or deceitful;

14              c.    Whether Defendants' conduct violated the Employment Laws and

15                   Regulations; and

16                        (i)     failed to compensate Plaintiff and the Class Members

17                                for all hours worked;

18                        (ii)    failed to compensate Plaintiff and the Class Members at the

19                                applicable and legally-mandated minimum hourly rate then in

20                                effect;

21                        (iii)   failed to provide Plaintiff and the Class Members with timely

22                                and accurate wage and hour statements;

23                        (iv)    failed to maintain complete and accurate payroll records for

24                                Plaintiff and the Class Members; and

25                        (v)     Misclassified Plaintiff and Class Members as independent

26                                contractors.

27              d.    Whether Defendants' systematic acts and practices violate, *inter alia*,

28                   California Business & Professions Code section 17200, *et seq*.

BOYAMIAN LAW,
INC.
550 N. BRAND
BLVD., STE 1500
GLENDALE, CA
91203

-9-
FIRST AMENDED COMPLAINT
Case No. 3:22-CV-08976-SI

37. <u>Typicality</u>.  Plaintiff's claims are typical of those of the other Delivery Drivers because all Delivery Drivers share the same or similar employment duties and activities, all are automatically classified as independent contractors, and all have been denied the benefits and protections of the Employment Laws and Regulations in the same manner.  Since Defendants have uniformly applied the same pay practices and policies to each Delivery Driver, Plaintiff's claims are typical of the claims of all Delivery Drivers.  Plaintiff's claims are also typical because Plaintiff has suffered the same damages as those suffered by all Class Members.

38. <u>Adequacy of Representation</u>.  Plaintiff can fairly and adequately represent and protect the interests of all Delivery Drivers in that Plaintiff does not have disabling conflicts of interest which are antagonistic to those of all other Delivery Drivers.  Plaintiff seeks no relief which is antagonistic or adverse to the other Class Members, and the infringement of their rights and the damages they have suffered are typical of all other Class Members.  Plaintiff's counsel is competent and experienced in litigating class actions in California based on large employers' violations of the Employment Laws and Regulations.

39. As mentioned above, to the extent that any Delivery Drivers entered into any arbitration agreement with any Defendant and such agreement purports to require arbitration, such agreement is void and unenforceable.  Even if such agreement is deemed enforceable, however, class-wide arbitration is appropriate and should be utilized to obtain class-wide relief.  This is so because as "last mile" delivery drivers, Delivery Drivers including Plaintiff are "transportation workers" within the meaning of 9 U.S.C. § 1 mandating their exemption from the Federal Arbitration Act altogether. Section 1 of the Federal Arbitration Act ("FAA") exempts from its coverage "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." (9 U.S.C. § 1.) The United States Supreme Court has defined the language "any other class of workers engaged in foreign or interstate commerce" to mean and include modern day "transportation workers." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 109 (2001). This includes those "transportation workers," like Plaintiff and the Delivery Drivers he seeks to represent who transport out-of-state goods even if they themselves do not cross state lines. *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 910-11 (9th Cir. 2020).

40. <u>Superiority of Class Action</u>.  The nature of this action and the nature of laws available to Plaintiff and the other Delivery Drivers in the putative Class make use of the class action a particularly efficient and effective procedure because:

    a.    For many of the Delivery Drivers, individual actions or other individual remedies would be impracticable and litigating individual actions would be too costly;

    b.    The action involves a large corporate employer or employers (XPO) and a large number of individual employees (Plaintiff and the other Class Members), many with relatively small claims and all with common issues of law and fact;

    c.    If the Delivery Drivers are forced to bring individual lawsuits, the corporate defendants would necessarily gain an unfair advantage, the ability to exploit and overwhelm the limited resources of individual Class Members with vastly superior financial and legal resources;

    d.    The costs of individual suits would likely consume the amounts recovered;

    e.    Requiring each Class Member to pursue an individual remedy would also discourage the assertion of lawful claims by current employees of Defendants, who would be disinclined to pursue an action against their present and/or former employer due to an appreciable and justified fear of retaliation and permanent damage to their immediate and/or future employment; and

    f.    Common business practices Plaintiff experienced are representative of those experienced by all Delivery Drivers and can establish the right of all Delivery Drivers to recover on the alleged claims.

////
////
////

BOYAMIAN LAW, INC.
550 N. BRAND BLVD., STE 1500
GLENDALE, CA 91203

**FIRST CAUSE OF ACTION**

**FAILURE TO PAY MINIMUM WAGE**

**(CAL. LABOR CODE §§ 1182.11, 1194 ET SEQ.; IWC WAGE ORDER NO. 9;**

**MINIMUM WAGE ORDER)**

41.  The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows a claim of relief.

42. At all times relevant to this complaint, Cal. Labor Code §§ 1182.11, 1182.12, and 1197, IWC wage order No. 9, and the Minimum Wage Order were in full force and effect and required that Defendant's California nonexempt employees receive the minimum wage for all hours worked irrespective of whether nominally paid on an hourly, piece rate, or any other basis, at the rate of eleven dollars ($11) per hour for work performed up through January 1, 2019, twelve dollars ($12) per hour for work performed up through January 1, 2020, thirteen dollars ($13) per hour for work performed up through January 1, 2021, fourteen dollars ($14) per hour for work performed up through January 1, 2022, and fifteen ($15) per hour for work performed up through January 1, 2023.

43. Defendants failed to pay Plaintiff and putative class members for all hours worked at the statutory minimum wage rate, as required by law, including for work time spent at mandatory meetings; work time spent waiting to receive assignments and merchandise at Defendant's client's stores or warehouses; work time spent picking up and transporting "haul away" merchandise; and work time spent returning paperwork to Defendant's client's stores at the end of the workday.

44. At various times throughout the relevant statutory period, Defendants have caused Plaintiff and putative class members to incur expenses and deductions that contributed to Defendants' failing to pay minimum wages for all hours worked, as required by law.

45. As a direct and proximate result of the acts and/or omissions of Defendants, Plaintiff and putative class members have been deprived of minimum wages due in amounts to be determined at trial, and to additional amounts as liquidated damages, pursuant to Cal. Labor Code §§ 1194 and 1194.2.

BOYAMIAN LAW,
INC.
550 N. BRAND
BLVD., STE 1500
GLENDALE, CA
91203

-12-
FIRST AMENDED COMPLAINT
Case No. 3:22-CV-08976-SI

1   46. By violating Cal. Labor Code §§ 1182.11, 1182.12, and 1197, IWC wage order No.

2   9, § 4, and the Minimum Wage Order, Defendants are also liable for civil penalties, interest and

3   reasonable attorneys' fees and costs under Cal. Labor Code §§ 558, 1194, 1197.1.

4   47. Plaintiff requests relief as described below.

5   <u>**SECOND CAUSE OF ACTION**</u>

6   **FAILURE TO PAY OVERTIME COMPENSATION**

7   **(CAL. LABOR CODE §§ 510, 1194 ET SEQ.; IWC WAGE ORDER NO. 9.)**

8   48.  The allegations of each of the preceding paragraphs are realleged and incorporated

9   herein by reference, and Plaintiff alleges as follows a claim of relief.

10   49. Defendants have been required, pursuant to Cal. Labor Code § 510 and IWC wage order No.

11   9, § 3, to pay Plaintiff and putative class members overtime compensation at a rate of 1.5 times

12   their regular rates of pay for all hours worked in excess of eight in a day and in excess of 40 in a

13   week, and at a rate of two times their regular rates of pay for all hours worked in excess of 12 in a

14   day.

15   50. Defendants failed to pay Plaintiff and putative class members daily or weekly overtime

16   compensation in violation of Cal. Labor Code § 510 and IWC wage order No. 9, § 3.

17   51. As a result of Defendants' unlawful acts, Plaintiff and putative class members have

18   been deprived of overtime compensation in an amount to be determined at trial, and are entitled to

19   recovery of such amounts, plus interest thereon, and attorneys' fees and costs, under Cal. Labor

20   Code § 1194.

21   52. By violating Cal. Labor Code § 510, Defendants are liable for civil penalties and

22   attorneys' fees and costs under Cal. Labor Code §§ 558, 1194, and 1197.1.

23   53. Plaintiff and putative class members as "last mile" delivery drivers are deemed "short

24   haul" operators or drivers within the meaning of 49 C.F.R. § 395.1(e)(1) and (e)(2) and are thus

25   exempt from the Federal Motor Carrier Safety Administration regulations.

26   54. Plaintiff requests relief as described below.

27   ////

28   ////

BOYAMIAN LAW,
INC.
550 N. BRAND
BLVD., STE 1500
GLENDALE, CA
91203

-13-
FIRST AMENDED COMPLAINT

Case No. 3:22-CV-08976-SI

**THIRD CAUSE OF ACTION**

**REIMBURSEMENT OF EMPLOYMENT EXPENSES**

**(CAL. LABOR CODE § 2802)**

55. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows a claim of relief.

56. Cal. Labor Code § 2802 provides: "An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer . . . . [which includes] all reasonable costs, including, but not limited to, attorney's fees incurred by the employee enforcing the rights granted by this section."

57. As a direct consequence of discharging their duties for Defendants and/or obeying Defendants' directions, Plaintiff and putative class members have necessarily incurred expenses for which they have not been indemnified by XPO, including the purchase and/or lease and depreciation of vehicles; fuel, maintenance, and other vehicle operating costs; various forms of insurance; wages paid to Delivery Drivers; costs associated with lost or damaged merchandise and other property damage; XPO proprietary uniforms; certain tools and equipment Defendants have required Plaintiff and class members to purchase or rent from XPO'S clients; other miscellaneous equipment including moving pads and blankets, dollies, hand tools, installation supplies, GPS navigational equipment, and cellular telephones; fees for payroll administration services; expenses associated with a cash bond or fund; and the attorneys' fees incurred to enforce Plaintiff's and putative class members' rights under Cal. Labor Code § 2802.

58. Defendants have failed to indemnify or in any manner reimburse Plaintiff and putative class members for these expenditures and losses.

59. By requiring Plaintiff and putative class members to pay expenses and cover losses that they incurred in direct consequence of the discharge of their duties for Defendants and/or in obedience of Defendants' direction, Defendants have violated and continues to violate Cal. Labor Code § 2802.

////

BOYAMIAN LAW,
INC.
550 N. BRAND
BLVD., STE 1500
GLENDALE, CA
91203

-14-
FIRST AMENDED COMPLAINT
Case No. 3:22-CV-08976-SI

60. As a direct and proximate result of Defendants' conduct, Plaintiff and putative class members have suffered substantial losses according to proof, as well as pre-judgment interest, costs, and attorneys' fees for the prosecution of this action, which losses are compensable under Cal. Labor Code §2802.

61. Plaintiff requests relief as described below.

### FOURTH CAUSE OF ACTION

### UNLAWFUL DEDUCTIONS FROM WAGES

### (CAL. LABOR CODE §§ 221 & 223; IWC WAGE ORDER NO. 9)

62. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows a claim of relief.

63. Cal. Labor Code § 221 provides: "It shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee."

64. Cal. Labor Code § 223 provides: "Where any statute or contract requires an employer to maintain the designated wage scale, it shall be unlawful to secretly pay a lower wage while purporting to pay the wage designated by statute or by contract."

65. IWC wage order No. 9, § 8 provides that the only circumstance under which an employer can make a deduction from an employee's wage due to cash shortage, breakage, or loss of equipment is if the employer can show that the shortage, breakage, or loss was the result of the employee's gross negligence or dishonest or willful act.

66. These and related statutes, along with California's fundamental public policy protecting wages and wage scales, prohibit employers from subjecting employees to unanticipated or unpredicted reductions in their wages; making employees the insurers of their employer's business losses; otherwise passing the ordinary business losses of the employer onto the employee; taking deductions from wages for business losses in any form unless the employer can establish that the loss was caused by a dishonest or willful act, or gross negligence of the employee; or taking other unpredictable deductions that may impose a special hardship on employees.

////

BOYAMIAN LAW,
INC.
550 N. BRAND
BLVD., STE 1500
GLENDALE, CA
91203

-15-
FIRST AMENDED COMPLAINT
Case No. 3:22-CV-08976-SI

1    67. Defendants have violated Cal. Labor Code §§ 221 and 223 and IWC wage order No. 9, § 8

2    by unlawfully taking deductions from Plaintiff's and putative class members' compensation to

3    cover certain ordinary business expenses of Defendants, including various forms of insurance;

4    uniforms; payment services; equipment and tools; losses associated with lost or damaged

5    merchandise and other property damage; gift cards and other payments given or reimbursed to

6    customers who complain or are dissatisfied with service they received; and "charge-back" items

7    Defendants claim to reserve the right to deduct from Plaintiff's and putative class members' pay.

8    68. Defendants have further violated Cal. Labor Code §§ 221 and 223 and IWC wage

9    order No. 9, § 8 by unlawfully taking deductions from Plaintiff's and putative class members'

10   compensation for the purpose of establishing a reserve account to draw upon to cover ordinary

11   business expenses, including compensation to customers complaining of damages to their

12   merchandise or to their homes.

13   69. Because Defendants made unlawful deductions from Plaintiff's and putative class

14   members' compensation, they are liable to Plaintiff and putative class members for the

15   compensation that should have been paid but for the unlawful deductions, pursuant to Cal. Labor

16   Code §§ 221 and 223 and IWC wage order No. 9, § 8.

17   70. By unlawfully deducting wages and failing to pay Plaintiff and putative class members,

18   Defendants are also liable for penalties, interest and reasonable attorneys' fees and costs

19   under Cal. Labor Code §§ 218.5 and 1194.

20   71. Plaintiff request reliefs as described below.

21   **FIFTH CAUSE OF ACTION**

22   **FAILURE TO PROVIDE MEAL PERIODS**

23   **(CAL. LABOR CODE §§ 226.7, 512; IWC WAGE ORDER NO. 9)**

24   72. The allegations of each of the preceding paragraphs are realleged and incorporated

25   herein by reference, and Plaintiff alleges as follows a claim of relief.

26   73. Plaintiff and putative class members have regularly worked in excess of five (5)

27   hours in a workday without being provided at least a half-hour meal period in which they were

28   relieved of all duties, as required by Cal. Labor Code §§ 226.7 and 512, and IWC Wage Order No.

BOYAMIAN LAW,
INC.
550 N. BRAND
BLVD., STE 1500
GLENDALE, CA
91203

-16-
FIRST AMENDED COMPLAINT
Case No. 3:22-CV-08976-SI

1 | 9, § 11(A).

2 | 74. Because Defendants failed to provide proper meal periods, they are liable to Plaintiff and

3 | putative class members for one hour of additional pay at the regular rate of compensation for each

4 | workday that the proper meal periods were not provided, pursuant to Cal. Labor Code § 226.7(b)

5 | and IWC wage order No. 9, § 11(B).

6 | 75. By violating Cal. Labor Code §§ 226.7 and 512, and IWC wage order No. 9, §11,

7 | Defendants are also liable for penalties, reasonable attorneys' fees, and costs under Cal. Labor Code

8 | §§ 218.5 and 1194.

9 | 76. Plaintiff and putative class members as "last mile" delivery drivers are deemed "short

10 | haul" operators or drivers within the meaning of 49 C.F.R. § 395.1(e)(1) and (e)(2) and are thus

11 | exempt from the Federal Motor Carrier Safety Administration regulations.

12 | 77. Plaintiff requests relief as described below.

13 | ## SIXTH CAUSE OF ACTION

14 | ### FAILURE TO AUTHORIZE AND PERMIT REST PERIODS

15 | ### (CAL. LABOR CODE § 226.7; IWC WAGE ORDER NO. 9)

16 | 78. The allegations of each of the preceding paragraphs are realleged and incorporated

17 | herein by reference, and Plaintiff alleges as follows a claim of relief.

18 | 79. Plaintiff and putative class members have regularly worked in excess of four (4)

19 | hours in a workday without Defendant's authorizing and permitting them to take at least a ten

20 | minute rest period, as required by Cal. Labor Code § 226.7 and IWC wage order No. 9, § 12.

21 | 80. Because Defendants failed to authorize and permit proper rest periods, Defendants are

22 | liable to Plaintiff and putative class members for one hour of additional pay at the regular rate of

23 | compensation for each workday that the proper rest periods were not authorized and permitted,

24 | pursuant to Cal. Labor Code § 226.7(b) and IWC wage order No. 9, § 12(B).

25 | 81. By violating Cal. Labor Code §§ 226.7 and 512, and IWC wage order No. 9, §11,

26 | Defendants are also liable for penalties, reasonable attorneys' fees, and costs under Cal. Labor Code

27 | §§ 218.5 and 1194.

28 | ////

BOYAMIAN LAW,
INC.
550 N. BRAND
BLVD., STE 1500
GLENDALE, CA
91203

-17-
FIRST AMENDED COMPLAINT
Case No. 3:22-CV-08976-SI

82. Plaintiff and putative class members as "last mile" delivery drivers are deemed "short haul" operators or drivers within the meaning of 49 C.F.R. § 395.1(e)(1) and (e)(2) and are thus exempt from the Federal Motor Carrier Safety Administration regulations.

83. Plaintiff requests relief as described below.

### SEVENTH CAUSE OF ACTION

### FAILURE TO FURNISH ACCURATE WAGE STATEMENTS

### (CAL. LABOR CODE §§ 226, 226.3; IWC WAGE ORDER NO. 9)

84. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows a claim of relief.

85. Cal. Labor Code § 226(a) and IWC wage order No. 9, § 7(B) require employers semi-monthly or at the time of each payment of wages to furnish each California employee with a statement itemizing, among other things, the total hours worked by the employee. Cal. Labor Code § 226(b) provides that if an employer knowingly and intentionally fails to provide a statement itemizing, among other things, the total hours worked by the employee, then the employee is entitled to recover the greater of all actual damages or fifty dollars ($50) for the initial violation and one hundred dollars ($100) for each subsequent violation, up to four thousand dollars ($4,000).

86. Defendants knowingly and intentionally failed to furnish Plaintiff and putative class members with timely, itemized statements that accurately report the total hours worked, as required by Cal. Labor Code § 226(a) and IWC wage order No. 9, § 7(B). As a result, Defendants are liable to Plaintiff and putative class members for the amounts provided by Cal. Labor Code § 226(b), including an award of costs and reasonable attorneys' fees.

87. Plaintiff requests relief as described below.

### EIGHTH CAUSE OF ACTION

### WAITING TIME PENALTIES

### (CAL. LABOR CODE §§ 201, 202, 203)

88. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows a claim of relief.

89. Cal. Labor Code § 201 requires an employer who discharges a California employee to pay

all compensation due and owing to that employee immediately upon discharge.

90. Cal. Labor Code § 202 requires an employer to pay all compensation due and owing to a California employee who quits within 72 hours of that employee's quitting, unless the employee provides at least 72 hours' notice of quitting, in which case all compensation is due at the end of the employee's final day of work.

91. Cal. Labor Code § 203 provides that if an employer willfully fails to pay compensation promptly upon discharge, as required by § 201 or § 202, then the employer is liable for waiting time penalties in the form of continued compensation of up to 30 work days.

92. Defendants willfully failed to timely pay compensation and wages, including unpaid minimum wage, unpaid overtime pay, unreimbursed expenses and unreimbursed reserve accounts, unpaid premium pay for missed meal periods, and unpaid premium pay for missed rest periods to Plaintiff and similarly situated putative class members no longer in Defendants' employ, upon termination of their employment. As a result, Defendants are liable to Plaintiff and similarly situated putative class members for waiting time penalties, together with interest thereon and reasonable attorneys' fees and costs, under Cal. Labor Code §§ 203 and 256.

93. Plaintiff requests relief as described below.

## NINTH CAUSE OF ACTION

### VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION ACT

### (CAL. BUSINESS & PROFESSIONS CODE §§ 17200-17209)

94. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference, and Plaintiff alleges as follows a claim of relief.

95. California Business & Professions Code § 17200 prohibits unfair competition in the form of any unlawful, unfair, or fraudulent business act or practice.

96. California Business & Professions Code § 17204 allows "any person acting for the interests of itself, its members or the general public" to prosecute a civil action for violation of the Unfair Competition Law.

97. Beginning at an exact date unknown to Plaintiff, but at least four years prior to the filing of this action, Defendants committed unlawful, unfair, and/or fraudulent business acts and

BOYAMIAN LAW,
INC.
550 N. BRAND
BLVD., STE 1500
GLENDALE, CA
91203

-19-

FIRST AMENDED COMPLAINT

Case No. 3:22-CV-08976-SI

1 | practices as defined by California Business & Professions Code § 17200, by engaging in the

2 | following:

3 |     a.    Failing to pay California minimum wage and overtime compensation to

4 |           Plaintiff and putative class members;

5 |     b.    Failing to provide adequate off-duty meal periods to Plaintiff and putative

6 |           class members, and failing to pay them premium pay for missed meal periods;

7 |     c.    Failing to authorize and permit adequate rest periods to Plaintiff and

8 |           putative class members, and failing to pay them premium pay for missed rest

9 |           periods;

10 |     d.    Failing to indemnify Plaintiff and putative class members for employment-

11 |          related business expenses and losses;

12 |     e.    Improperly and unlawfully making deductions from Plaintiff's and plaintiff

13 |          class members' compensation to cover certain ordinary business expenses and losses

14 |          of Defendant, which were not attributable to Plaintiff's and putative class members'

15 |          dishonest or willful act, or to their gross negligence, as described above;

16 |     f.    Improperly and unlawfully demanding a cash bond from Plaintiff and

17 |          putative class members, and making deductions from such bonds in violation of the

18 |          Employee Bond Law, Cal. Labor Code §§ 400-410;

19 |     g.    Failing to maintain workers' compensation insurance covering Plaintiff and

20 |          putative class members, requiring Plaintiff and putative class members to purchase

21 |          workers' compensation insurance for themselves, and failing to pay compensation to

22 |          Plaintiff and putative class members injured on the job;

23 |     h.    Failing to contribute to the Unemployment Trust Fund on behalf of Plaintiff and

24 |          putative class members;

25 |     i.    Failing to pay all wages due upon termination of employment to Plaintiff

26 |          and similarly situated putative class members no longer in Defendant's employ;

27 |     j.    Failing to provide accurate itemized wage statements to Plaintiff and

28 |          putative class members;

BOYAMIAN LAW,
INC.
550 N. BRAND
BLVD., STE 1500
GLENDALE, CA
91203

-20-
FIRST AMENDED COMPLAINT
Case No. 3:22-CV-08976-SI

k.      Failing to keep accurate payroll records noting the actual hours worked by Plaintiff and putative class members, in violation of Cal. Labor Code § 1174 and IWC wage order No. 9, § 7(A);

l.      Failing to pay all wages for labor performed between the 1st and 15th days of the month between the 16th and the 26th day of the month during which the labor was performed, and failing to pay all wages for labor performed between the 16th and the last day of the month between the 1st and 10th day of the following month, as required by Cal. Labor Code § 204;

m.      Willfully misclassifying Plaintiff and putative class members as "independent contractors" in violation of the California Employee Misclassification Act, Cal. Labor Code § 226.8;

n.      Failing to provide Plaintiff and putative class members paid sick leave as required by Cal. Labor Code § 246; and

o.      Intentionally, recklessly and/or negligently misrepresenting to Plaintiff and putative class members the true nature of their employment status.

98. The violations of these laws serve as unlawful, unfair, and/or fraudulent predicate acts and practices for purposes of Business & Professions Code § 17200.

99. As a direct and proximate result of Defendants' unlawful, unfair, and/or fraudulent acts and practices described herein, Defendants have received and continue to hold ill-gotten gains belonging to Plaintiff and putative class members. As a direct and proximate result of Defendants' unlawful business practices, Plaintiff and putative class members have suffered economic injuries including, but not limited to out-of-pocket business expenses, unlawful deductions from compensation, loss of minimum wage and overtime wages, compensation for missed meal periods, compensation for missed rest periods, loss of unemployment insurance benefits, loss of amounts paid into cash bonds and interest thereon, waiting time penalties, and attorneys' fees and costs incurred to enforce their rights, including their rights under Cal. Labor Code § 2802.  Defendants have profited from its unlawful, unfair, and/or fraudulent acts and practices in the amount of those business expenses, improper deductions from compensation,

BOYAMIAN LAW,
INC.
550 N. BRAND
BLVD., STE 1500
GLENDALE, CA
91203

-21-

FIRST AMENDED COMPLAINT

Case No. 3:22-CV-08976-SI

1  unpaid minimum wage and overtime, unpaid compensation for missed meal periods and missed rest

2  periods, unpaid unemployment insurance and workers' compensation premiums, cash bond

3  payments, and interest accrued.

4    100.    Plaintiff and putative class members are entitled to restitution pursuant to Cal.

5  Business & Professions Code §§ 17203 and 17208 for all unpaid business expenses, unlawful

6  deductions from compensation, minimum wage, overtime, meal period and rest period

7  compensation, unemployment insurance and workers' compensation premiums, cash bond

8  payments, unpaid waiting time penalties, interest since at least four years prior to the filing of this

9  action, and attorney's fees and costs Plaintiff has incurred to enforce these rights, including their

10  rights under Cal. Labor Code § 2802.

11    101.    Plaintiff and putative class members are entitled to enforce all applicable penalty

12  provisions of the California Labor Code pursuant to Business & Professions Code § 17202.

13    102.    By all of the foregoing alleged conduct, Defendants have committed, and are

14  Continuing to commit, ongoing unlawful, unfair and fraudulent business practices within the

15  meaning of Cal. Business & Professions Code §17200 *et seq*.

16    103.    As a direct and proximate result of the unfair business practices described above,

17  Plaintiff and putative class members have suffered significant losses and Defendants have been

18  unjustly enriched.

19    104.    Pursuant to Cal. Business & Prof. Code §17203, Plaintiff is entitled to: (a)

20  restitution of money acquired by means of its unfair business practices, in amounts not yet

21  ascertained but to be ascertained at trial; (b) injunctive relief against Defendant's continuation of its

22  unfair and unlawful business practices; and (c) a declaration that Defendant's business practices are

23  unfair and unlawful within the meaning of the statute.

24    105.    Plaintiff assumed the responsibility of enforcement of the laws and lawful claims

25  specified herein.  There is a financial burden incurred in pursuing this action which is in the public

26  interest. Therefore, reasonable attorneys' fees are appropriate pursuant to Cal. Code of Civil

27  Procedure § 1021.5.

28    106.    Plaintiff requests relief as described below.

BOYAMIAN LAW, INC.
550 N. BRAND BLVD., STE 1500
GLENDALE, CA 91203

-22-
FIRST AMENDED COMPLAINT
Case No. 3:22-CV-08976-SI

**<u>TENTH CAUSE OF ACTION</u>**

**VIOLATIONS OF THE PRIVATE ATTORNEYS GENERAL ACT OF 2004**

**(CAL. LABOR CODE §§ 2698, *et seq.*)**

107.    As a separate and distinct cause of action, Plaintiff complains and realleges all of the allegations contained in this complaint and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action. Plaintiff is an aggrieved employee as defined in Labor Code § 2699 (a).  Plaintiff brings this cause on behalf of himself, and other current or former employees affected by the labor law violations alleged in this complaint.

108.    Defendant XPO LAST MILE, INC., at all times relevant to this complaint, were employers or persons acting on behalf of an employer who violated Plaintiff's rights by violating relevant sections of the California Labor Code and are subject to civil penalties.

109.    Defendant XPO LAST MILE, INC. committed the following violations of the Labor Code against Plaintiff, and, on information and belief, against other current or former employees while they were employed by Defendants:

(a)    Defendants violated Labor Code §§ 201-203 by failing to pay all wages due on the date of the employee's involuntary termination or within 72 hours of the employee's voluntary termination.

(b)    Defendants violated Labor Code §§ 204 and 210 by failing to pay all wages due at least twice during each calendar month, in compliance with those provisions.

(c)    Defendants violated Labor Code §§ 216 and 225.5 by, having the ability to pay, willfully refusing to pay wages due and payable after demand has been made.

(d)    Defendants violated Labor Code §§ 226 and 226.3 by failing to provide accurate itemized wage statements.

(e)    Defendants violated Labor Code §§ 510, 551, 552, and 558 and provisions of the applicable IWC Wage Order by failing to compensate Class Members, including Plaintiff, at one and one-half times the regular rate of pay for any work in excess of eight hours in a day and 40 hours in a week.

1        (f)      Defendants violated Labor Code §§ 210, 226.7, and 512 by failing to

2 provide meal and rest periods compliant with California law.

3        (g)      Defendants violated Labor Code § 1174 by failing to maintain payroll

4 records showing the daily hours worked.

5        (h)      Defendants violated Labor Code §§ 1194 and 1197 and provisions of the

6 applicable IWC Wage Order by failing to pay the legal minimum wage.

7        (i)      Defendants violated Labor Code § 246 by failing to provide paid sick days

8 in compliance with California law.

9        (j)      Defendants violated Labor Code § 226.8 by misclassifying Class Members,

10 including Plaintiff, as independent contractors and depriving them of the benefits and protections

11 of the California Labor Code and rights customarily afforded to employees in the state of

12 California.

13    110.      As set forth above, Plaintiff provided written notice on or about October 24, 2022,

14 by certified mail to the Labor and Workforce Development Agency and to Defendant XPO LAST

15 MILE, INC. of the facts and theories regarding the violations of the Employment Laws and

16 Regulations.  Attached as **Exhibit "2"** is a true and correct copy of the letter sent to the LWDA and

17 Defendant XPO LAST MILE, INC.  More than sixty-five days has elapsed since Plaintiff's

18 submission to the LWDA.  The LWDA has not taken any action, nor advised Plaintiff that it intends

19 to take action, to investigate the violations of the California Labor Code alleged herein and has not

20 provide any written notice.

21    111.      Pursuant to PAGA, Plaintiffs should be awarded twenty-five percent (25%) of all

22 penalties due under California law, including attorneys' fees and costs.

23 **PRAYER FOR RELIEF**

24    WHEREFORE, Plaintiff, individually and on behalf of all Delivery Drivers, prays that the

25 Court enter judgment in their favor and against Defendants as follows:

26    1.      For an Order requiring and certifying this action as a class action;

27    2.      For an Order appointing Plaintiff's counsel as Class Counsel;

28    3.      For compensatory damages in an amount to be ascertained at trial;

BOYAMIAN LAW,
INC.
550 N. BRAND
BLVD., STE 1500
GLENDALE, CA
91203

-24-
FIRST AMENDED COMPLAINT
Case No. 3:22-CV-08976-SI

1    4.    For restitution in an amount to be ascertained at trial;

2    5.    For punitive damages in an amount to be ascertained at trial;

3    6.    For penalties as required by the applicable Wage Order or otherwise by law;

4    7.    For prejudgment interest at the legal rate pursuant to California Labor Code section

5    218.6 and other applicable sections;

6    8.    For reasonable attorney's fees pursuant to California Labor Code § 1194;

7    9.    For cost of suit incurred herein;

8    10.    For disgorgement of profits garnered as a result of Defendants' unlawful failure to

9    pay overtime premium compensation and meal and rest period compensation; and

10    11.    For such further relief as the Court may deem appropriate.

11    DATED: September 15, 2023                          **BOYAMIAN LAW, INC.**

12

13                                          By:  _A. R. K_____

14                                               Michael H. Boyamian
                                                 Armand R. Kizirian
15                                               Attorneys for Plaintiff MAYNOR MEJIA and
                                                 All Others Similarly Situated
16

17

18

19

20                          **<u>DEMAND FOR JURY TRIAL</u>**

21    Plaintiff MAYNOR MEJIA, individually and on behalf of all similarly situated

22    individuals, demand jury trial of this matter.

23    DATED: September 15, 2023                          **BOYAMIAN LAW, INC.**

24

25                                          By:  _A. R. K_____

26                                               Michael H. Boyamian
                                                 Armand R. Kizirian
27                                               Attorneys for Plaintiff MAYNOR MEJIA
                                                 and All Others Similarly Situated
28

BOYAMIAN LAW,
INC.
550 N. BRAND
BLVD., STE 1500
GLENDALE, CA
91203

-25-
FIRST AMENDED COMPLAINT
Case No. 3:22-CV-08976-SI

Exhibit "1"

# DELIVERY SERVICE AGREEMENT

**by and between**

**ABC Logistics LLC**

**And**

**XPO LAST MILE, INC.**

Doc ID: 20180621150229928
Sertifi Electronic Signature

This Agreement (as defined in Section 1), effective June 22, 2018 ("Effective Date"), is made by and between XPO Last Mile, Inc., with offices at 1851 West Oak Parkway, Suite 100, Marietta, GA 30062 ("XPO Last Mile") and ABC Logistics LLC, having an office at 992 Torrano Ave, Apt 4, Hayward, CA, 94542 ("Contract Carrier"). XPO Last Mile and Contract Carrier shall be collectively referred to as the "Parties".

**WHEREAS**, Contract Carrier is authorized as a motor carrier by the Federal Motor Carrier Safety Administration, and as an established motor carrier, owns and operates an independent delivery business; and

**WHEREAS,** XPO Last Mile is authorized as a freight forwarder by the Federal Motor Carrier Safety Administration and provides logistical and warehousing services to its national retail customers; and

**WHEREAS,** Contract Carrier represents that it is a fully qualified motor carrier in interstate commerce and owns and operates a business which can meet the requirements of XPO Last Mile's retail customers; and

**WHEREAS**, Contract Carrier seeks to provide delivery and related services to XPO Last Mile and XPO Last Mile desires to engage Contract Carrier to provide delivery and related services;

**IT IS, THEREFORE**, in consideration of the mutual covenants contained herein, agreed as follows:

**Objectives.**  This Agreement sets forth arrangements to accomplish the safe and efficient pick up, transportation, delivery, and installation of freight.  These objectives are strictly limited to achieving required results – delivery and installation services which meet the service levels of XPO Last Mile's customers.  The manner and means of obtaining such results are entirely within the discretion of Contract Carrier.  No officer, employee or agent of XPO Last Mile shall have the authority to impose any term or condition on Contract Carrier which is contrary to this understanding, and nothing in this Agreement shall be interpreted in a contrary manner.

1.    **Agreement.**  This Agreement consists of the Delivery Service Agreement (the "DSA"), all Schedule A's which may be entered into between the Contract Carrier and XPO Last Mile on or after the effective date of the DSA, attached Schedule B, and all other written modifications, addenda and schedules which are executed by both Parties contemporaneous with or after the execution of the DSA.  This Agreement may not be modified except by writing, duly executed by both Parties.  This Agreement supersedes prior negotiations, representations and agreements, whether written or oral.  Any documents executed by both Parties prior to the effective date of this Agreement shall not modify any of the terms of the Agreement.

2.    **Engaged Services.**  The parties agree that the engagement of services is non-exclusive.  Contract Carrier warrants that its business has the capacity to, and shall promptly accept, timely deliver and install freight tendered by XPO Last Mile on dates in which it has offered its services.  Contract Carrier is not obligated to accept freight and may transport freight for other companies.  Contract Carrier acknowledges that XPO Last Mile has not provided any

representation, guarantee or warranty that: (a) any particular volume of freight will be tendered by XPO Last Mile to Contract Carrier; and (b) XPO Last Mile will use the services of Contract Carrier on each and every instance in which Contract Carrier is available to haul freight.

      **3.1**    <u>**Service Results.**</u>  Contract Carrier acknowledges that it maintains discretion and control to accomplish its obligations under this Agreement.  XPO Last Mile does not evaluate Contract Carrier's performance.  XPO Last Mile's obligations herein are limited to tendering to Contract Carrier freight which is ready for immediate delivery.  Contract Carrier shall deliver such freight and achieve results which meet the levels of service established by XPO Last Mile's customers.  To achieve these business objectives, Contract Carrier:

      (a)    Will maintain the capacity necessary to provide pick up, delivery, and related services on days and at times which are compatible with XPO Last Mile's customer schedules;

      (b)    Has the expertise to handle, load, unload and transport merchandise using methods that are designed to avoid theft, loss and damage;

      (c)    Will cooperate with XPO Last Mile's employees, customers and other Contract Carriers to achieve the goal of efficient pick-up, delivery, handling, loading and unloading, and set-up or installation of merchandise;

      (d)    Will provide services in a manner consistent with white glove delivery industry standards;

      (e)    Will conform to all applicable federal, state and local laws, regulations and ordinances; and

      (f)    Will cause vehicles used to be operated safely and in compliance with all applicable laws and regulations.

      **3.2**    In the event Contract Carrier becomes unable to complete its services obligations under this Agreement, in whole or in part, and/or in accordance with the time requirements imposed, Contract Carrier shall immediately notify XPO Last Mile, which shall have the right, but not the obligation, to provide alternate transportation and delivery services for such freight at Contract Carrier's expense.

      **3.3**    <u>**Tools of the Trade.**</u>  Contract Carrier warrants that it possesses or will at its own expense acquire all equipment including vehicles and tools of the trade necessary to competently perform services pursuant to this Agreement.  Such equipment includes, but is not limited to, handheld mobile computer devices and cellular phones, mobile applications and communication devices capable of reading UPC barcodes or other identifiers as may be used by XPO Last Mile or its customers, as will be communicated to Contract Carrier upon execution of this Agreement and as may be modified from time to time.  Inasmuch as Contract Carrier's capabilities as set

forth in this Agreement are essential to providing services, it is agreed that no Payment shall be due and owing to Contract Carrier unless it is fully compliant with this Provision.

      3.4    Contract Carrier acknowledges that the use of handheld mobile devices and mobile applications are necessary to document services provided under this Agreement. Contract Carrier shall use such devices and applications in the completion of its services to XPO Last Mile. Payment to Contract Carrier shall be contingent on such use.

      3.5    **Consumer Safety and Security**. Contract Carrier recognizes that its services will be performed in residential homes and with regular interaction with XPO Last Mile customer end consumers. In order to provide a suitable level of security and comfort to such end consumers, Contract Carrier agrees that all of the employees, subcontractors and agents of its company will comply with identification, security and appearance standards applicable to in-home delivery. Such obligations will include, but not be limited to, Contract Carrier's obligations set forth in Section 14 of this Agreement.

      4.1    **Independent Relationship**. It is expressly intended by the Parties hereto, and Contract Carrier hereby specifically warrants, represents and agrees, that Contract Carrier and XPO Last Mile are independent entities having their own established businesses. XPO Last Mile and Contract Carrier intend that this Agreement is strictly between two independent entities and does not create an employer/employee relationship for any purpose. As such, it is agreed between the Parties that Contract Carrier shall have sole control over the manner and means of performing its obligations under this Agreement.

      4.2    **Contract Carrier's Discretion**. It is specifically agreed that Contract Carrier shall be responsible for exercising independent discretion and judgment to achieve the business objectives and results specified above, and no officer, agent or employee of XPO Last Mile shall have the authority to direct Contract Carrier as to the manner or means employed to achieve such objectives and results. For example, no officer, agent or employee of XPO Last Mile shall have the authority to prescribe hours of work, what route the Contract Carrier is to follow, or other details of service. XPO Last Mile will not specify or require that a minimum number of hours or a minimum volume of pickups and deliveries be maintained. If XPO Last Mile or its customer(s) should at any time indicate in any manner its policies or procedures with regard to the specific means by which Contract Carrier shall perform its obligations under this Agreement, such communications shall be construed to be advisory only; the ultimate determination regarding the methods by which the purposes of this Agreement are to be accomplished is entirely committed to Contract Carrier.

      4.3    **Maintaining Independence**.

      (a)    Contract Carrier warrants, represents and agrees, except as otherwise provided herein, that neither Contract Carrier nor any of its agents or employees shall advertise or otherwise represent that it or they are (or have been) in any way associated or affiliated with XPO Last Mile or its customer(s), including on loan applications;

      (b)    XPO Last Mile warrants, represents and agrees, except as otherwise

provided herein, that neither XPO Last Mile nor any of its agents or employees shall advertise or otherwise represent that it or they are (or have been) in any way associated or affiliated with Contract Carrier;

(c)    Contract Carrier warrants, represents and agrees, that neither the Contract Carrier nor any of its agents or employees shall make any use whatsoever of the corporate name, trade names or trademarks of XPO Last Mile or its customer(s); and

(d)    XPO Last Mile warrants, represents and agrees that neither XPO Last Mile nor any of its agents or employees shall make any use whatsoever of the corporate name, trade names or trademarks of Contract Carrier.

**4.4**    <u>**Compliance with Laws.**</u> Contract Carrier warrants, represents and agrees that:

(a)    Contract Carrier does and will pay all contributions, taxes, and other payments or charges required to be paid by an employer in accordance with the provisions of all applicable state unemployment insurance, disability benefits, and withholding tax laws, the Federal Insurance Contributions Act, and Federal Unemployment Tax Act and Federal Internal Revenue Code, and does and will comply with all other local, state, and federal laws, regulations, and requirements applicable to its employees or affecting their compensation or conditions of employment applicable to the Contract Carrier or the performance of its services hereunder;

(b)    Contract Carrier has obtained all necessary certificates, permits, franchise, operating authority, or licenses required in connection with the performance of such services (including, but without limitation, all applicable regulations relating to the qualifications or maximum hours of service of employees or the safety of operation or standards of equipment), and that it does and will carry Workmen's Compensation and Employer's Liability Insurance;

(c)    Contract Carrier does not have an unsatisfactory or unfit safety rating issued by any regulatory authority with jurisdiction over Contract Carrier's operations, including but not limited to the Federal Motor Carrier Safety Administration.

(d)    Contract Carrier agrees to notify XPO Last Mile in writing by certified mail within fifteen (15) calendar days of any event, occurrence, action or representation by Contract Carrier, its officers, employees or agents or by XPO Last Mile and its customers, its officers, employees or agents which, in the Contract Carrier's opinion affects Contract Carrier's ability to act as an independent entity under the terms of the Agreement. The details of such alleged event shall be set forth with specificity, including date, time, place, persons involved, witnesses, and the alleged conduct.

5.    **Contract Carrier's Employees.**    Contract Carrier agrees that it retains complete and exclusive direction and control over its employees and all those working for it in any capacity.  As such Contract Carrier may, without prior notice to XPO Last Mile, employ or otherwise provide qualified person(s) to assist Contract Carrier in performing the obligations specified by this Agreement.  All persons so employed or provided by Contract Carrier, either driving or non-driving, shall be qualified pursuant to applicable federal, state and municipal safety standards.  All persons employed or provided by Contract Carrier shall be fully trained, at Contract Carrier's expense and discretion, to operate all equipment used in furtherance of this Agreement.  Contract Carrier understands and agrees that such persons shall not be considered employees of XPO Last Mile and that it is Contract Carrier's responsibility to assure that such persons conform fully to the applicable obligations undertaken by Contract Carrier pursuant to this Agreement.  Contract Carrier further agrees to:

(a)    Assume sole responsibility for ensuring that its employees, agents and workers are screened and qualified in accordance with the same standards as Contract Carrier was screened and qualified prior to its engagement for the services to be provided herein, and in conformance with all requirements as may be communicated by XPO Last Mile from time to time;

(b)    Bear all expenses associated with qualifying such persons to perform the services agreed to be provided herein, including, without limitation, the cost of physical examinations, background checks and drug screen tests;

(c)    Bear all expenses associated with the employment of such persons, including, without limitation, wages, salaries, employment taxes, workers' compensation coverage, health care, retirement benefits and insurance coverages;

(d)    Assume sole responsibility with respect to such persons for compliance with all applicable laws, rules, and regulations, including but not limited to wage and hour laws, discrimination law, immigration laws and all laws relating to employment such as orders respecting payroll deductions and maintenance of payroll and employment records; and,

(e)    Hold XPO Last Mile and its customers harmless from, and waive any right of subrogation in connection with, any liability and claims by others or by government agencies arising from Contract Carrier's relationship with Contract Carrier's employees, agents, workers or substitutes whether under industrial accident prevention laws or any other federal, state or municipal laws applicable to the relationship between employers and employees, agents or workers.

6.1    **Bond or Cash Fund.**    Contract Carrier shall post a cash bond or maintain a fund to be used for the adjustment of claims between the Parties.  Contract Carrier agrees to post the sum of $5,000 per vehicle used in the performance of services under this Agreement, and to

maintain such fund at a minimum level of $5,000 per vehicle.  Contract Carrier authorizes XPO Last Mile to use the fund to pay for the actual amount of damages for any and each loss or claim resulting from Contract Carrier's services under this Agreement.  Contract Carrier shall be strictly liable for all such damages or claims including but not limited to:

      (a)     Charges for loss of merchandise;
      (b)     Damages to merchandise;
      (c)     Damages to XPO Last Mile property;
      (d)     Damages to other property for which XPO Last Mile may be held liable; and
      (e)     Damages to XPO Last Mile client's customer home, person and/or property.

      **6.2**    **Withdrawals From Fund.**    If the withdrawals from the fund are made at any time during the term of this Agreement and Contract Carrier does not restore the fund to a minimum balance of $5,000 per vehicle, Contract Carrier hereby authorizes XPO Last Mile to retain from any settlements due to it under this Agreement such amounts as shall be required to accumulate the sum of $5,000 per vehicle, as promptly as possible.  The rate and schedule for such retainage shall in no event be less than $100 per settlement.

      **6.3**    **Return of Fund.**    Upon termination of this Agreement, and provided there are no outstanding claims, threatened litigation or administrative action, pending judgments, or other circumstances related to Contract Carrier's performance under this Agreement which, in the reasonable discretion of XPO Last Mile, could have an adverse impact on its financial interests, and provided Contract Carrier has fulfilled the terms and conditions of this Agreement, all monies remaining in the fund will be returned to Contract Carrier.  At the time of the return of the monies in the fund, XPO Last Mile may, however, withhold amounts sufficient to satisfy any other claims or obligations of Contract Carrier to XPO Last Mile specified by the terms of this Agreement which remain outstanding and shall provide a final accounting in writing to Contract Carrier of all such final withholdings made from the fund.  The net fund balance shall be returned by XPO Last Mile to Contract Carrier no later than forty-five (45) days after the termination of this Agreement.

      **7.**    **Loss or Damage To Product.**    Unless otherwise noted on a duly executed exception notification document, acceptance of an article for delivery by Contract Carrier shall constitute its acknowledgment that the merchandise was accepted free from damage.  Contract Carrier shall be fully liable for the loss, theft, or destruction of or any damage to any merchandise in its custody or control in the delivery process.  Contract Carrier shall return all damaged merchandise at its expense to the point of origin or, with Contract Carrier's consent, to other points as instructed by XPO Last Mile.  In addition to all other remedies in law and equity, XPO Last Mile shall have the right to offset such damages from Contract Carrier's reconciliation for services performed under this Agreement, provided such amounts are reasonably substantiated.

      **8.**    **Damage to Property.**  Contract Carrier is responsible for all damage to property during the performance of its services under this Agreement.  All damages to Customer's

property must be settled to the customer's satisfaction within seven (7) days of occurrence.  Any damage claim not settled in seven (7) days will be paid directly to the customer by XPO Last Mile and offset on Contract Carrier's reconciliation for services performed under this Agreement.

**9.1    Payment.**  XPO Last Mile shall pay Contract Carrier within fourteen (14) days following each week of services (Sunday through Saturday) performed by Contract Carrier under this Agreement.

**9.2    Payment Schedules.**  Payment shall be made pursuant to any Schedule A(s) attached hereto and made part of this Agreement.  Such schedule(s) shall be separately negotiated and executed by the Parties and may from time to time be superseded or adjusted by subsequently negotiated and executed Schedule A(s).  Services provided by Contract Carrier under a XPO Last Mile Direct addendum to this Agreement shall be deemed to be separate and apart from services provided under the attached Schedule A(s).  The payment schedule under the Direct addendum is for Direct services only and not added to the Schedule A payment schedule. Payment agreements under a XPO Last Mile Direct addendum shall not supersede or modify the terms of this Agreement or a Schedule A.

**9.3    Reconciliation.**  On a weekly basis, XPO Last Mile shall reconcile the amount of Payments due to Contract Carrier for services rendered under this Agreement with any offsets for claims or losses resulting from Contract Carrier's services under this Agreement as set forth in Sections 6, 7 and 8 above.  In the event such claims or losses exceed the monies available for offsets to Payments, Contract Carrier authorizes XPO Last Mile to use the fund created under Section 6 to pay such claims or losses.

**9.4**    Upon termination of this Agreement, XPO Last Mile shall have the right to holdback remaining Payments due until final reconciliation as provided by Section 19.

**10.    Forms and Records.**  XPO Last Mile shall be allowed to reasonably review Contract Carrier's operation to ensure compliance with the terms of this Agreement.  This includes a reasonable review of Contract Carrier's records, and the maintenance of certain information as may be required by XPO Last Mile.  XPO Last Mile may contact customers directly to verify the level of services provided by Contract Carrier.

**11.    Service Commitment.**  Contract Carrier guarantees prompt and efficient service by its agents and employees to the reasonable satisfaction of XPO Last Mile and the end customer.  Prompt service shall include hauling freight at the time it is available for tender by XPO Last Mile to Contract Carrier.  Contract Carrier's failure to provide or arrange for services after its commitment to haul available freight shall be deemed a breach of this Agreement.

**12.    Required Insurance.**  At all times at its own expense, Contract Carrier shall maintain insurance of the kinds and amounts specified in the attached Schedule D attached hereto and made part of this Agreement.

13.    **Haul Away Services.**  In the event haul away services are provided under this Agreement, they shall be undertaken as follows:

(a)    Contract Carrier shall remove, haul away, and, as applicable, either return or properly dispose of all products as may be specified by XPO Last Mile or its customer. Contract Carrier shall fully comply with all inventory and documentation requirements pertaining to identification of product(s) and documenting the chain of custody of said product(s) from XPO Last Mile's or its customers' facility to the end point of product disposal.

(b)    Contract Carrier further agrees and warrants that it bears the full responsibility for properly disposing of said products, including CFC's, compressor oils and hazardous wastes in accordance with all applicable federal, state and local environmental laws, including laws related to landfill and waste management and all similar laws, rules and regulations.  Contract Carrier agrees that in all aspects of its performance under this Agreement, it will comply with all relevant applicable laws and regulations, including federal and as may apply, the state and local jurisdictions within which it operates.

14.    **Background Checks.**  Contract Carrier acknowledges that individuals it uses to complete its obligations under this Agreement may enter customers' residences or premises, or have direct contact with a customer.  Contract Carrier agrees that before any services are provided under this Agreement, it will complete background checks on any individual it uses to complete its obligations under this Agreement, regardless of whether the individual is an employee, owner, or contractor of Contract Carrier.  Contract Carrier agrees that it will also complete drug screening consistent with industry standards with respect to all such individuals before services are performed under this Agreement.

(a)    Contract Carrier agrees that the background checks and drug screens will be conducted by a reputable and qualified third-party background check service.  The background check will include a review of criminal court records of all counties of known residence.  If the background check reveals that the individual has been convicted of criminal activity similar to the crimes listed in Schedule B attached hereto and made part of this Agreement, or a drug screen yields a positive result, the Contract Carrier agrees not use the individual to provide services in connection with its services under this Agreement.

(b)    Contract Carrier is solely responsible for all costs and other aspects of the background check and drug screening process and disqualification determinations, including compliance with all federal, state and/or local laws in this regard (e.g., providing proper forms, notices, and disclosures to affected individuals, etc.).

(c)    Contract Carrier agrees to indemnify and hold harmless XPO Last Mile, to the fullest extent of the law, from any claims, including the cost of

Doc ID: 20180621150229928
Sertifi Electronic Signature

defending such claims, related to each background check and/or drug screen, each disqualification determination, and Contract Carrier's failure to properly conduct the background checks as outlined herein.

(d)    Contract Carrier shall maintain the results of the criminal background checks for all individuals subject to these background check requirements. The Contract Carrier agrees to certify and document its compliance with this provision, and provide proof of same to XPO Last Mile at its request.

**15.    Indemnification.**    CONTRACT CARRIER SHALL AT ALL TIMES (BOTH DURING AND AFTER THE TERM HEREOF) DEFEND, INDEMNIFY AND HOLD HARMLESS XPO LAST MILE, ITS CUSTOMERS, AGENTS, EMPLOYEES, AND AFFILIATES AGAINST AND FROM ANY AND ALL SETTLEMENTS, LOSSES, DAMAGES, COSTS, COUNSEL FEES AND ALL OTHER EXPENSES RELATING TO OR ARISING FROM ANY AND ALL CLAIMS (WHETHER OR NOT GROUNDLESS) OF EVERY NATURE OR CHARACTER (INCLUDING, BUT WITHOUT LIMITATION, CLAIMS FOR PERSONAL INJURY, DEATH AND DAMAGE TO PROPERTY) ASSERTED AGAINST XPO LAST MILE (A) BY CONTRACT CARRIER OR ANY AGENT OR EMPLOYEE OF CONTRACT CARRIER; (B) BY ANY OTHER PERSON OR ENTITY WHOSE ACTIONS OR CLAIMS ARISE OUT OF SERVICES PERFORMED OR ARE IN CONNECTION WITH THIS AGREEMENT; OR (C) BY ANY OTHER PERSON OR ENTITY WHICH ALLEGES ACTS OR OMISSIONS RELATED TO OR ARISING OUT OF SERVICES PERFORMED IN CONNECTION WITH THIS AGREEMENT.  XPO LAST MILE RESERVES THE RIGHT TO OFFSET AGAINST PAYMENT DUE TO CONTRACT CARRIER AMOUNTS FOR CLAIMS XPO LAST MILE REASONABLY BELIEVES ARE DUE UNDER THIS SECTION.  IN THE EVENT SUCH CLAIMS OR LOSSES EXCEED THE MONIES AVAILABLE FOR OFFSETS TO PAYMENTS, CONTRACT CARRIER AUTHORIZES XPO LAST MILE TO USE THE FUND CREATED UNDER SECTION 6 TO PAY SUCH CLAIMS OR LOSSES.

**16.    Notices.**    All notes, requests, demands, and other communications hereunder shall be in writing to the Parties at the addresses given below, unless another address shall be furnished to the other party in writing:

Notices to Contract Carrier shall be sent to:

ABC Logistics LLC
992 Torrano Ave, Apt 4
Hayward, CA  94542

Notices to XPO Last Mile shall be sent to:

XPO Last Mile, Inc.
6314 Fly Road
East Syracuse, NY  13057

17.    **Term of Agreement.**    This Agreement shall become effective on [Effective Date] and shall remain in effect for one year.  The Agreement shall be automatically renewed at the end of the term for a successive one-year term unless either party gives written notice of its intention not to renew fifteen (15) days before expiration of the term.

18.1    **Termination of Agreement.**  This Agreement may be terminated as follows:

    a.    At any time by mutual written agreement of Contract Carrier and XPO Last Mile Companies;

    b.    By Contract Carrier or XPO Last Mile if the other party breaches or fails to perform the obligations imposed by this Agreement;

    c.    By either party in the event XPO Last Mile: (1) ceases to do business in all or part of the contract area served; or (2) as a result of a decline in business, or a reduction in operations in all or part of the area served by this Agreement; or

    d.    By either party upon fifteen (15) day written notice to the other.

18.2    **Termination Obligations.**  Upon termination of this Agreement for any reason, Contract Carrier agrees promptly to:

    a.    Return to XPO Last Mile any merchandise tendered for delivery, along with  any shipping papers, documents, collections or other property of XPO Last Mile in Contract Carrier's possession;

    b.    Return to XPO Last Mile any property of XPO Last Mile furnished to Contract Carrier in connection with Contract Carrier's performance of its services under this Agreement; and

    c.    Remove and return or permanently mask all of XPO Last Mile and/or XPO Last Mile's customers' vehicle identification from all vehicles and/or equipment used pursuant to this Agreement.

19.    **Final Reconciliation.**  Upon termination of this Agreement, final reconciliation, including any holdbacks, will be paid forty-five (45) days from the date of termination.

20.    **Notice of Agreement Payment Breach.**  An "Agreement Payment Breach" is any demand for or controversy involving alleged payments due pursuant to Schedule A of this Agreement or any other amount(s) alleged due to Contract Carrier.  Written notice of an "Agreement Payment Breach" must be made within 14 days of the event or occurrence giving rise to such alleged breach or alleged incorrect Payment, and in no event later than 14 days after Final Reconciliation is paid.  Written notice shall be made by certified mail to the address set forth in this Agreement, shall contain the heading "Notice of Agreement Payment Breach", and provide a detailed statement specifying the precise nature of the alleged breach.  The notice

requirements set forth in this Provision shall not apply to any other types of alleged contract breach.

**21.1**     <u>**ARBITRATION OF CLAIMS.**</u>   The parties agree that any demand, assertion, or claim or cause of action for money, property, enforcement of a right, or equitable relief, including but not limited to allegations of misclassification or wage and hour violations (except as carved out below) arising out of or relating to the Agreement, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules (except as may be modified by this Arbitration Agreement), and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof, if necessary. In the event of a misclassification dispute, the parties expressly agree to use the commercial rules until a determination of employment statute has been made. The Commercial Arbitration Rules are available at www.adr.org. As specified in Paragraph 21.3, this Arbitration Agreement applies to any existing or future dispute brought by either Contract Carrier or XPO Last Mile arising out of or related to the Agreement or Contract Carrier's relationship with XPO Last Mile, including but not limited to allegations of misclassification or wage and hour violations. The provisions of this Arbitration Agreement will remain in force after the parties' contractual relationship ends. **BY AGREEING TO ARBITRATE ALL DISPUTES CONTEMPLATED BY THIS ARBITRATION AGREEMENT, THE PARTIES AGREE THAT ALL SUCH DISPUTES WILL BE RESOLVED THROUGH BINDING ARBITRATION BEFORE AN ARBITRATOR AND NOT BY WAY OF A COURT OR JURY TRIAL.**

**21.2**     <u>**INAPPLICABILITY TO CERTAIN PENDING LITIGATION.**</u>   This Arbitration Agreement does not apply to claims asserted by settlement class members in any lawsuit that is pending against XPO Last Mile as of the Effective Date (as defined in Paragraph 21.10) that has been settled in principle, provided that (i) the settlement class member does not opt out of the settlement and (2) the settlement receives final approval from the Court. Any claims asserted by settlement class members who opt out of the settlement in such cases will be subject to this Arbitration Agreement, and if the settlement does not receive final approval, all claims asserted by the settlement-class members will be subject to this Arbitration Agreement. In addition, this Arbitration Agreement does not apply to claims asserted by the named plaintiffs in any lawsuit pending against the XPO Last Mile as of the Effective Date, or to claims asserted by those Contract Carriers who have expressly consented in writing to join a pending lawsuit as a plaintiff, provided that writing is signed and dated prior to the Effective Date.

**21.3**     <u>**APPLICATION TO EXISTING CLAIMS AND CONTROVERSIES.**</u>   This Arbitration Agreement is intended broadly to apply to all covered controversies (as set forth above subject to the exceptions in Paragraphs 21.2 and 21.6), including those arising prior to and after the Effective Date.

**21.4**     <u>**MAKING A DEMAND FOR ARBITRATION.**</u>   Any demand for arbitration under this Arbitration Agreement must be submitted to a regional office of the AAA for processing and administration, and a copy of any such demand shall be simultaneously sent to the other party. The Arbitrator will resolve all disputes regarding the timeliness or propriety of the demand for arbitration.

**21.5**     <u>**ENFORCEABILITY.**</u>   Except as noted Paragraph 21.6, the arbitrator, and not any federal, state, or local court, shall have exclusive authority to resolve any dispute relating to

the formation, enforceability, applicability, or interpretation of this Arbitration Agreement, including without limitation any claim that this Arbitration Agreement is void or voidable. Thus, except as noted in Paragraph 21.6, the parties voluntarily waive the right to have a court determine the enforceability of this Arbitration Agreement. In the event any portion of this Arbitration Agreement is deemed unenforceable, then such portion will be modified or, if modification is not possible, stricken to the extent necessary to allow enforcement of this Arbitration Agreement, and the remaining provisions will remain in full force and effect.

**21.6    CLASS AND COLLECTIVE ACTION WAIVER. THIS ARBITRATION AGREEMENT PROHIBITS THE ARBITRATOR FROM CONSOLIDATING THE CLAIMS OF OTHERS INTO ONE PROCEEDING. THIS MEANS AN ARBITRATOR SHALL HEAR ONLY INDIVIDUAL CLAIMS AND IS PROHIBITED FROM FASHIONING A PROCEEDING AS A CLASS OR COLLECTIVE ACTION OR AWARDING RELIEF IN SUCH A PROCEEDING.** Any question or dispute concerning the scope or validity of this paragraph shall be decided by a court of competent jurisdiction and not the arbitrator. Should a court determine that this paragraph is invalid for any reason, the parties hereby waive any right to arbitration of a class or collective action and instead agree and stipulate that such claims will be heard only by a judge.

**21.7    ATTORNEYS' FEES AND ARBITRATION COSTS.** Each party will pay the fees for its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. Costs incidental to the arbitration, including the cost of the Arbitrator and the meeting site ("Arbitration Costs"), will be borne by XPO Last Mile and Contract Carrier equally, unless otherwise required by applicable law. Any dispute regarding a party's obligation to pay Arbitration Costs will be determined by the Arbitrator. In the event Contract Carrier contends that, as a matter of law, it is not responsible for payment of any Arbitration Costs, Contract Carrier will have no obligation to pay any portion of the contested Arbitration Costs until, and only if, the Arbitrator determines that Contract Carrier is responsible for the costs. If necessary for arbitration of the dispute, XPO Last Mile agrees to cover the amount of the Arbitration Costs contested by Contract Carrier until such time as the Arbitrator determines payment responsibility. If the Arbitrator determines that Contract Carrier is responsible for any amount of the Arbitration Costs already paid by XPO Last Mile, Contract Carrier will remit payment of that amount to XPO Last Mile within 30 days of the Arbitrator's determination.

**21.8    CHOICE OF LAW.** The Arbitrator shall apply the substantive law of the State of Georgia or federal law, or both, as applicable to the claim(s) asserted. The Arbitrator's authority to render a decision shall be bound by the principles of Georgia or federal substantive laws and any decision shall not be contrary to same.

**21.9    POST-ARBITRATION PROCEDURES.** Within 30 days of the close of the arbitration hearing (which period may be extended by stipulation of the parties), any party will have the right to prepare, serve on the other party, and file with the Arbitrator a post-arbitration brief. The Arbitrator may award any party any remedy to which that party is entitled under applicable law, but such remedies will be limited to those that would be available to a party in his or her or its individual capacity in a court of law for the claims presented to and decided by the Arbitrator, and no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Arbitration Agreement. The Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law. Except as may be permitted or required by law, as determined by the Arbitrator, neither a party nor an Arbitrator may disclose the existence, content, or results of any arbitration without the prior

written consent of the parties.  A court of competent jurisdiction will have the authority to enter a judgment upon the award made pursuant to the arbitration.

   **21.10**   **OPT-OUT PROVISION.**  If Contract Carrier does not want to be subject to this Arbitration Agreement, Contract Carrier may opt out by notifying XPO Last Mile in writing of Contract Carrier's desire to opt out of this Arbitration Agreement, which writing must be delivered either (1) by email, stating Contract Carrier's name and expressing Contract Carrier's intent not to be subject to this Arbitration Agreement, to arbitrationoptout@xpo.com or (2) by letter dated, signed and submitted by U.S. Mail or hand delivery to Legal Department at 6314 Fly Road, East Syracuse, NY 13057.  In order to be effective, the writing must (1) clearly indicate Contract Carrier's intent to opt out of this Arbitration Agreement, and (2) be sent (if delivered via email), post-marked (on the envelope containing the signed writing, if delivered by U.S. Mail), or delivered (if delivered by hand) within 30 days of the date this Arbitration Agreement is signed by Contract Carrier ("Effective Date").  Contract Carrier's writing opting out of this Arbitration Agreement will be filed with a copy of this Arbitration Agreement and maintained by XPO Last Mile.  Should Contract Carrier not opt out of this Arbitration Agreement within the 30-day period, Contract Carrier and XPO Last Mile will be bound by the terms of this Arbitration Agreement. **A UNILATERAL ELECTION BY CONTRACT CARRIER TO OPT OUT WILL NOT RESULT IN TERMINATION OF ANY OTHER AGREEMENT BETWEEN THE PARTIES OR ANY FORM OF PENALTY, RETALIATION, OR DISADVANTAGING OF CONTRACT CARRIER BY XPO LAST MILE.**

   **21.11**   **RIGHT TO CONSULT WITH AN ATTORNEY.**   Contract Carrier has the right to consult with private counsel of Contract Carrier's choice with respect to any aspect of, or any claim that may be subject to, this Arbitration Agreement

   **22.**      **Non-Exclusive Agreement.**  It is understood and agreed that this is a non-exclusive Agreement and there is no requirement for XPO Last Mile to use Contract Carrier's services exclusively or that Contract Carrier exclusively provides services to XPO Last Mile. Contract Carrier and XPO Last Mile may enter into other agreements for similar services with other parties in any area.

   **23.**      **No Agency Relationship.**  The parties agree and acknowledge that they are separate, unrelated business entities.  Nothing in this Agreement shall be construed to (a) give either Party the power to direct or control the daily activities of the other Party, or (b) constitute the Parties as principal and agent, employer and employee, franchisor and franchisee, partners, joint venturers, co-owners, or otherwise affiliated.

   **24.**      **Intent of the Agreement.**  The intent of the Agreement is to include all items necessary for the proper execution and completion of the services by the Contract Carrier. Performance by the Contract Carrier shall be required only to the extent consistent with the Agreement and reasonably inferable from the Agreement as being necessary to produce the indicated results.

   **25.**      **Construction.**  This Agreement shall be construed and interpreted fairly, in accordance with the plain meaning of its terms, and there shall be no presumption or inference against the party drafting this Agreement in construing or interpreting the provisions.

26.    __Recitals.__  The statements set forth above in the "Whereas" clauses are affirmed as true and correct and are made part of this Agreement as though more fully set forth herein.

27.    __Assignment.__  This Agreement is binding upon the Parties and their respective successors and assigns, but Contract Carrier's obligations under this Agreement are not assignable without the prior written consent of XPO Last Mile.  Any assignment without XPO Last Mile's consent shall be null and void.

28.    __SEVERABILITY.__   SHOULD ANY PART OF THIS AGREEMENT FOR ANY REASON BE DECLARED BY ANY COURT OF COMPETENT JURISDICTION TO BE INVALID, SUCH DECISION SHALL NOT AFFECT THE VALIDITY OF ANY REMAINING PORTION, WHICH REMAINING PORTION SHALL CONTINUE IN FULL FORCE AND EFFECT AS IF THIS AGREEMENT HAD BEEN EXECUTED WITH THE INVALID PORTION HEREOF ELIMINATED, IT BEING THE INTENTION OF THE PARTIES THAT THEY WOULD HAVE EXECUTED THE REMAINING PORTION OF THIS AGREEMENT WITHOUT INCLUDING ANY SUCH PART, PARTS OR PORTIONS WHICH MAY FOR ANY REASON BE HEREAFTER DECLARED INVALID.

29.    __Acknowledgement__.   Contract Carrier acknowledges and represents that Contract Carrier has read and fully understands the provisions of this Agreement, and has had sufficient time and opportunity to consult with personal, financial, tax and legal advisors prior to executing this Agreement.

**-- The remainder of this page was intentionally left blank --**

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed as set forth below.

**XPO Last Mile, Inc.**

Date: **06/21/2018**    By: ___ Joseph Gagne _____

Title: __ Contract Carrier Administrator _____

Signature:

> E-Signed : 06/21/2018 03:19 PM CST
> *Joseph Gagne*
> joseph.gagne@xpo.com
> IP: 165.225.38.222        Sertifi Electronic Signature
> DocID: 20180621150229928

Date **06/21/2018**    By: Mejia Lopez,Maynor

Title: Business Owner

Signature:

> E-Signed : 06/21/2018 03:06 PM CST
> *Maynor Mejia*
> abclogisticsllc1@gmail.com
> IP: 73.158.212.95        Sertifi Electronic Signature
> DocID: 20180621150229928

Exhibit "2"



# BOYAMIAN LAW

October 24, 2022

**SUBMITTED ELECTRONICALLY VIA ONLINE SUBMISSION**

Labor and Workforce Development Agency
Attention: PAGA Administrator
455 Golden Gate Avenue, 9th Floor
San Francisco, California 94102

Re:    *Mejia adv. XPO Last Mile, Inc., et al.*
       Notice of PAGA Claims Pursuant to Labor Code § 2699.3

To Whom It May Concern:

My office represents Maynor Mejia (hereinafter "Claimant"), with respect to claims on behalf of himself and other similarly situated current and former Contract Carriers, Drivers and Driver Assistants (commonly referred to as "Helpers") (collectively, hereinafter referred to as "Delivery Drivers") of XPO Last Mile, Inc. ("XPO") who worked in California from October 24, 2021 and continuing through the present ("Relevant Time Period"). The purpose of this letter is to satisfy the notice requirements of Labor Code § 2699.3(a). Also, under separate cover and being sent out today, is a check made out to the Labor Workforce and Development Agency in the amount of seventy-five dollars ($75.00) for the filing fee of this matter.[1]

Below we set forth the facts and theories which we believe support our contention that XPO has violated and continues to violate various provisions of the California Labor Code including, but not limited to, the misclassification of Delivery Drivers, including assistant drivers and helpers, and the resulting failures by XPO to pay minimum wages and overtime wages, to provide meal and rest periods, and to reimburse for necessary business expenditures.

### Facts & Theories About the Case

Mr. Mejia is a former Contract Carrier and Driver who was misclassified by XPO Last Mile, Inc. as an independent contractor. Mr. Mejia provided delivery services for XPO and for XPO's corporate clients from approximately June 22, 2018 to on or about April 11, 2022. Mr. Mejia primarily worked out of the warehouse owned and/or operated by XPO located at 1600 Atlantic St. in Union City, California.

XPO has violated California's labor laws with respect to paying its Contract Carriers, Drivers and Helpers, such as Maynor Mejia, for all hours worked, including overtime payment, among other things. XPO provides logistics and delivery services to its retail merchants like Peloton, Macy's, Samsung, and others, to deliver product and

---

[1] Sent Via First Class U.S. Mail to the following address: Department of Industrial Relations, Accounting Unit, 455 Golden Gate Avenue, 10th Floor, San Francisco, CA 94102.

services to their clients' customers.  XPO utilizes Delivery Drivers, including assistant drivers and helpers, to pick up the merchandise at the merchants' stores or warehouses and to deliver and install them at the customers' homes or businesses.  Delivery Drivers, including assistant drivers and helpers, are responsible for, among other things, maintaining quality control, delivering purchased products to customers at their place of work or residence, and ensuring that customer service is achieved in accordance with the standards set by XPO.

Our investigation has revealed that XPO unlawfully classifies its Delivery Drivers, including assistant drivers and helpers, as independent contractors when, in fact, they are heavily regulated through a series of restrictions and directives through XPO. Specifically, XPO secures truck owners and contracts with such truck owners for purposes of delivering, installing, and picking up of merchandise and products to XPO clients' customers.  These truck owners go to the warehouses of XPO's clients and go through a hiring process with XPO's employees who are officed at the same site.  Truck owners are hired by XPO.  Truck owners then bring on drivers and driver assistants who are also evaluated by XPO for hiring purposes.  Delivery Drivers provide "last mile" delivery, installation, and haul away services.  These services are integral and essential to XPO's core business.[2]

XPO's Delivery Services Agreement requires that Delivery Drivers subject themselves to a background check and drug and alcohol test, and that XPO reserves the right to require both pre-engagement and post-engagement alcohol and drug tests of all its Contract Carriers.  The Agreements are pre-printed contracts of adhesion that are drafted exclusively by XPO and/or on its behalf by its agents. The terms of the Agreement are non-negotiable.  Through this agreement, XPO reserves and actually exercises the right to control the manner and means by which the Delivery Drivers perform their duties for XPO and its clients.

Through the Delivery Service Agreement, XPO requires each Contract Carrier to create his or her own "corporation" or "limited liability company." XPO refers its Delivery Drivers to a company that processes the paperwork to create a purported

---

[2] Delivery Drivers, including Mr. Mejia, can also assert claims against Samsung, Peloton, and others through Labor Code § 2810.3.  Specifically, Delivery Drivers and Mr. Mejia are able to assert their claims against these entities in their capacity as a Client Employer.  *See* Labor Code § 2810.3(1)(A) ("'Client employer' means a business entity, regardless of its form, that obtains or is provided workers to perform labor within its usual course of business from a labor contractor.") The fact of the matter is, Delivery Drivers, including Mr. Mejia, would not have to show a joint employment relationship between XPO and these various retail companies to hold the latter accountable for XPO's wage and hour violations.  It is enough that XPO's corporate clients retained XPO for delivery services, and that XPO's supervisors proceeded to violate California's wage and hour laws as to Mr. Mejia's and Delivery Drivers' work.

corporate or limited liability company entity for each Contract Carrier, and requires the Contract Carrier to go through this process. In fact, these business entities are nothing more than fictitious business names for the Contract Carrier themselves, and serve no purpose other than to perpetuate and to shield XPO's scheme of mischaracterizing its employees as independent contractors.  In the case of Mr. Mejia, he was required to form "ABC Logistics LLC" for purposes of securing work from XPO on terms favorable to XPO but to the detriment of him and other similarly situated Delivery Drivers by virtue of their misclassification as independent contractors.  The Delivery Service Agreement also requires Delivery Drivers, like Mr. Mejia, to "agree" to pay numerous expenses incident to the employment, and to assume various risks that ordinarily and by law are the responsibility of an employer.

XPO has a series of directives that Delivery Drivers, including assistant drivers and helpers, must abide by despite the fact that XPO unlawfully classifies them as independent contractors.  XPO reserves the right to determine the locations where the Delivery Drivers pick up and drop off the merchandise assigned to them; the time of day when they must report to work; and the order and timing of their deliveries. XPO provides each Delivery Driver a daily manifest of work assignments that includes the delivery address, the "service window" time when the delivery must be made, and whether the Delivery Driver is required to call the customer 30 minutes ahead of arrival to give notice of when they will make the delivery.  The Delivery Drivers must complete all of the work assigned to them and are not allowed to refuse assignments.  XPO reserves the right to control the Delivery Drivers' physical appearance, including requiring them to wear XPO uniforms. XPO also reserves the right to require the Delivery Drivers to know and follow XPO's customer service standards in performing their work, and conduct surveys to determine whether customers are satisfied with the Delivery Drivers' work.

XPO further reserves the right to require the Delivery Drivers, including assistant drivers and helpers, to follow certain work methods related to, for example, how to move, wrap, and install the furniture and how to interact with customers.  XPO determines the year, branding, and other specifications of the vehicles that the Delivery Drivers use to perform their work.  XPO prescribes how the Delivery Drivers document their work and require the Delivery Drivers to contact XPO upon arrival at each stop and then again after the delivery is completed.  XPO also reserves the right to require the Delivery Drivers to call each customer 30 minutes before making the delivery to let the customers know they are on their way.  XPO employs a variety of managerial and supervisory employees who instruct the Delivery Drivers on their job performance and their delivery assignments.  The Delivery Drivers interact with XPO's personnel on a daily basis.  XPO's managerial and supervisory employees also hold regular in-person and/or telephonic meetings where the Delivery Drivers' attendance is mandatory.

The Delivery Drivers are paid each week by XPO a flat amount for each delivery, or for each day or week of work, in amounts that are unilaterally determined by XPO. XPO makes deductions from the Delivery Drivers' pay for reasons including customer

complaints, late deliveries, and damaged items and property. This "flat rate" constitutes an unlawful piece-rate compensation system because drivers and helpers had no control over how many hours they worked and could do nothing to change the amount of pay through their own efficiencies.

XPO requires the Delivery Drivers to purchase multiple forms of insurance coverage in amounts determined by XPO through insurance plans specified and sometimes negotiated by XPO, and to name XPO as additional "insureds." XPO further requires the Delivery Drivers to purchase or rent from XPO certain tools and equipment.

XPO directs Delivery Drivers to engage helpers to deliver the assigned merchandise. XPO prohibits the Delivery Drivers from working with helpers who have not been screened, qualified, and approved in advance by XPO. XPO expects helpers to follow the same work methods and standards it requires the Delivery Drivers to follow and to comply with all other requirements communicated by XPO, including attendance at meetings held by XPO's managers.

XPO permits Delivery Drivers to engage other Drivers and/or Helpers at their own expense who have been screened, qualified, and approved by XPO. Delivery Drivers may engage such Drivers and/or Helpers so that they are able to take a day off from work, such as for example when they are unable to come to work due to illness or so that they may have a day of rest. XPO expects Drivers and/or Helpers to follow the same work methods and standards it requires the Delivery Drivers to follow and to comply with all other requirements communicated by XPO, including following instructions given by XPO's managers and attending mandatory meetings.

The Delivery Drivers are economically dependent for their financial livelihood on XPO, and XPO is entirely dependent on the Delivery Drivers for the retail merchandise delivery service provided by XPO to its clients. The Delivery Drivers are terminable at will. They may be terminated upon fifteen- or thirty-days written notice without cause or immediately for alleged breaches of the broadly-worded standards and obligations described in the agreements the Delivery Drivers sign.

Most of the Delivery Drivers have worked, or did work, for XPO for several years. Despite XPO's pervasive control over all aspects of its delivery service operation, including the details of the Delivery Drivers' work, XPO has classified and treated the Delivery Drivers as "independent contractors." XPO's classification and treatment of the Delivery Drivers as "independent contractors" rather than as "employees" is and during all relevant times has been unlawful.

As a result of XPO's misclassification of the Delivery Drivers, including their assistant drivers and helpers, as "independent contractors," XPO has:

(1) required and/or knowingly permitted Delivery Drivers, including their assistant drivers and helpers, to work hours considerably in excess of eight hours per day, 12 hours per day, and/or 40 hours per week. Claimant is informed and believes, and on that basis alleges, that it has been XPO's policy and practice to require

and/or knowingly and willfully permit Delivery Drivers, including their assistant drivers and helpers, to work such overtime hours without paying them overtime compensation required by the California Labor Code;

(2) failed to indemnify them – specifically as to the Delivery Drivers - for the employment expenses they necessarily incur in performing their assigned job duties for XPO, such as the costs of providing and operating a XPO-approved delivery vehicle, including fuel, maintenance, repair, cleaning, marking, and licensing; XPO uniforms; wages paid to helpers and assistant drivers; insurance, including workers' compensation and employer's liability insurance, automobile liability insurance, general liability insurance, umbrella insurance, and cargo insurance; certain tools and equipment XPO requires the Delivery Drivers to purchase or rent from its clients; gift cards and other payments made to customers in response to customer complaints; losses associated with lost or damaged merchandise and other property damage; payroll administration services; and the equipment required to perform their duties, including moving pads, dollies, hand tools, and cellular telephones. XPO has taken deductions from Delivery Drivers' compensation to cover many of these, and other, employment-related expenses;

(3) failed to provide a 30 minute off-duty meal period to the Delivery Drivers, including their assistant drivers and helpers, who worked more than five hours in a day. As a result of XPO's misclassification of the Delivery Drivers, including their assistant drivers and helpers, as "independent contractors," XPO has failed to provide a second 30 minute off-duty meal period to the Delivery Drivers, including their assistant drivers and helpers, who worked more than 10 hours in a day;

(4) failed to authorize and permit a rest period of ten minutes per every four hours, or major fraction thereof, worked. As a result of XPO's misclassification of the Delivery Drivers, including their assistant drivers and helpers, as "independent contractors," XPO has failed to pay Federal and California minimum wage compensation to the Delivery Drivers, including their assistant drivers and helpers, for all hours worked;

(5) failed to pay to the Delivery Drivers, including their assistant drivers and helpers, all wages due and owing twice per month at the times prescribed by Cal. Labor Code § 204;

(6) failed to itemize the total hours worked on wage statements furnished to the Delivery Drivers, including their assistant drivers and helpers, as required by Cal. Labor Code §§ 226, 226.3, and Wage Order 9;

(7) not properly maintained payroll records showing the actual hours the Delivery Drivers, including their assistant drivers and helpers, worked each day as required by Cal. Labor Code § 1174 and IWC wage order No. 9, § 7(A);

(8) willfully and knowingly failed to pay Delivery Drivers and their assistant drivers and helpers, upon termination of employment, all accrued compensation, including reimbursement of all unlawful deductions from wages, payment of missed meal and rest period compensation, and payment of minimum wage and overtime compensation;

(9) failed to maintain workers' compensation insurance covering the Delivery Drivers and their assistant drivers and helpers, and instead has required the Delivery Drivers to purchase their own workers' compensation insurance coverage and failed to contribute to the Unemployment Trust Fund on their behalf; and

(10) failed to provide Delivery Drivers, including their assistant drivers and helpers, with paid sick time off in accordance with Cal. Labor Code § 246.

Claimant seeks to recover the unpaid compensation for all hours worked as defined by the Labor Code and the applicable Industrial Welfare Commission wage order as to the time during which an employee is subject to the control of an employer, and includes all the time the employee is engaged, suffered or permitted to work, whether or not required to do so, or as otherwise set forth in *Dynamex Operations West, Inc. v. Superior Court of Los Angeles*, 4 Cal.5th 903 (2018). California law requires that all hours worked over 8 in a day or 40 in a week or worked on the 7th consecutive day of a work week be paid 1.5 times an employee's regular rate of pay. *See, e.g.*, Lab. Code §§ 510, 1194; Cal. Code Regs., tit. 8, § 11090, *et seq.* In addition, hours worked over 12 in a day or hours over 8 worked on the 7th consecutive day in a week are paid at 2 times an employee's regular rate of pay.

Likewise, the pre-arranged delivery schedule, for which Delivery Drivers, including their assistant drivers and helpers, have no discretion to change or alter, does not account for meal or break time. California law also requires that an employer provide an employee who works more than five hours a meal break that is no less than 30 minutes in duration. 8 CCR 11090(11)(A). Unless an employee is relieved of all duty during the 30-minute meal period, the meal period is considered an on-duty meal period and counted as time worked. However, an on-duty meal period is permitted only when the nature of the work prevents an employee from being relieved of all duty and the parties agree in writing to an on-the-job paid meal period. *Id.* If an employer fails to provide an employee a lawful meal period, the employer must pay the employee one hour of pay for each violation. 8 CCR 11090(11)(D). Additionally, California law mandates that an employer must "authorize and permit" an employee to take a duty-free rest period not less than 10 minutes in duration for every four hours of work. 8 CCR

11090(12)(A).  Violation of the rest break provisions requires the employer pay the employee one hour of pay for each workday a rest period was not provided. 8 CCR 11090(12)(B).  Lastly, in California, the employer is required to keep records of all hours worked.  Labor Code § 1174(d).

Additionally, Labor Code §226.8 states: (a) It is unlawful for any person or employer to engage in any of the following activities:

(1)  Willful misclassification of an individual as an independent contractor,

(2)   Charging an individual who has been willfully misclassified as an independent contractor a fee, or making any deductions from compensation, for any purpose … arising from the individual's employment where any of the acts described in this paragraph would have violated the law if the individual had not been misclassified."

Claimants will likewise establish that XPO willfully misclassified them and all other similarly situated Delivery Drivers, including assistant drivers and helpers, as independent contractors based on the numerous practices and policies in place during the Relevant Time Period.  Furthermore, XPO did charge these people and make deductions from compensation for damages and charges they chose to impose on these individuals. The penalty for this wrongdoing by any *de facto* employer appears in Labor Code §226.8 (b), to wit,

"If … a court issues a determination that a person or employer has engaged in any of the enumerated violations of subdivision (a), the person or the employer shall be subject to a civil penalty of not less than five thousand dollars ($5,000) and not more than fifteen thousand dollars ($15,000) for each violation, in addition to any other penalties or fines permitted by law."

Because Claimant and other similarly situated Delivery Drivers, including assistant drivers and helpers, were misclassified as "independent contractors," and therefore not fully compensated for all hours worked, were deprived of overtime compensation, XPO also failed to provide accurate wage statements in a violation of Labor Code Section 226, and failed to fully compensate former employees in a timely manner when their employment ended, in violation of Labor Code Section 201 *et seq*.

Accordingly, we believe that XPO has violated, and continues to violate, numerous provisions of California law, including, without limitation Labor Code Sections §§ 201, 202, 203, 204, 210, 216, 221, 223, 225.5, 226, 226.3, 226.7, 226.8, 246, 510, 511, 512, 551, 552, 558, 1194-1197.1, 1198, 2802, and 2698, *et seq*., as well as the relevant IWC orders and regulations, and that Claimant and other similarly situated Delivery Drivers, including assistant drivers and helpers, are entitled to all statutory penalties allowed by law.  Our investigation is continuing, and there may be more violations uncovered.

We respectfully request that the Labor Workforce Development Agency notify this office within thirty (30) days if it wishes to investigate this matter further.  Should you have any questions or concerns or require additional information, please do not hesitate to contact the undersigned.

Should you have any questions or concerns or require additional information, please do not hesitate to contact the undersigned.  If XPO wishes to resolve these claims without resorting to protracted litigation, please contact the undersigned forthwith to discuss this matter further.

Thank you for your immediate attention to this matter.

Very truly yours,

Michael H. Boyamian

Cc:     XPO Last Mile, Inc. (*Sent via Certified U.S. Mail, Return Receipt Requested*)
        1505 Corporation 1231 (*Agent of Service of Process*)
        Registered Agent Solutions, Inc.
        720 14th Street
        Sacramento, CA 95814