MICHAEL H. BOYAMIAN, SBN 256107
michael@boyamianlaw.com
ARMAND R. KIZIRIAN, SBN 293992
armand@boyamianlaw.com
**BOYAMIAN LAW, INC.**
550 North Brand Boulevard, Suite 1500
Glendale, California 91203
Telephone:    (818) 547-5300
Facsimile:    (818) 547-5678

Attorneys for Plaintiff Maynor Mejia Lopez,
Individually and On Behalf
of All Others Similarly Situated

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAYNOR MEJIA LOPEZ, an individual; Individually and on Behalf of All Similarly Situated Individuals,<br><br>Plaintiff,<br><br>v.<br><br>XPO LAST MILE, INC., A Georgia Corporation; and DOES 1 through 25, Inclusive,<br><br>Defendants. | Case No.: 3:22-CV-08976-SI<br>(*Assigned for all purposes to the Hon. Susan Illston*)<br><br>**CLASS ACTION**<br><br>**PLAINTIFF MAYNOR MEJIA LOPEZ'S NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION**<br><br>Date:          May 29, 2026<br>Courtroom:  1 – 17th Floor, San Francisco<br>Time:          10:00 a.m.<br>Judge:         Hon. Susan Illston |

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION – Case No. 3:22-CV-08976-SI

**PLEASE TAKE NOTICE** that on May 29, 2026 at 10:00 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Susan Illston in Courtroom 1 - 17th Floor of the United States District Court for the Northern District of California, located at 450 Golden Gate Ave., San Francisco, CA, Plaintiff Maynor Mejia Lopez will and hereby does move for an order to certify the following class and classes pursuant to Federal Rules of Civil Procedure, Rule 23(a) and (b)(3):

**All individuals who performed delivery services for Defendant XPO Last Mile, Inc. a/k/a RXO Last Mile, Inc. (hereinafter "Defendant" or "XPO"), in the state of California who were classified as independent contractors or as a non-employee and worked as a Contract Carrier, Driver, and/or Helper from April 29, 2018, to the date of trial.**

Alternatively, Plaintiff proposes for class certification the following subclasses:

Contract Carrier Subclass: All individuals who performed delivery services for Defendant in the state of California and executed a "Delivery Service Agreement" with XPO from April 29, 2018, to the date of trial;

Driver Subclass: All individuals who performed delivery services for Defendant in the state of California as non-employee "Driver" from April 29, 2018, to the date of trial.

Helper Subclass: All individuals who performed delivery services for Defendant in the state of California as a non-employee "Helper" from April 29, 2018, to the date of trial.

Plaintiff further seeks to have certified for resolution each of the nine causes of action alleged in his Second Amended Complaint [Dkt. 79], including his claims for Defendant's failure to pay minimum wages under California law ( Cal. Lab. Code §§ 1194, 1194.2, 1197), Defendant's failure to pay overtime wages under California law ( Cal. Lab. Code §§ 510, 1194, 1198), Defendant's failure to reimburse all business expenses (Cal. Lab. Code §§ 2800 and 2802), Defendant's failure to provide compliant meal periods and rest breaks ( Cal. Lab. Code §§ 226.7 and 512), Defendant's violation for unlawful deductions from wages (Cal. Lab. Code §§ 221 and 223), Defendant's failure to pay wages upon separation of employment and within the required time (Cal. Lab. Code §§ 201- 203), Defendant's failure to furnish accurate and itemized wage statements ( Cal. Lab. Code § 226), and Defendant's violation of

1

California's Unfair Competition Law ( Cal. Bus. & Prof. Code §§ 17200, et seq.).

Lastly, Plaintiff will and hereby does move for the Court to appoint Plaintiff as Class Representative and Plaintiff's counsel – Boyamian Law, Inc. and attorneys Michael H. Boyamian and Armand R. Kizirian – as Class Counsel under Rule 23(g) of the Federal Rules of Civil Procedure.

This motion is based on the accompanying memorandum of points and authorities; the Declaration of Michael H. Boyamian; including the deposition transcript excerpts and documents attached to the Declaration; the Declaration of Armand R. Kizirian; the Compendium of Plaintiff and Class Member Declarations; such oral argument as may be heard by the Court; and all other papers on file in this action.

Respectfully Submitted,

Dated: April 10, 2026          BOYAMIAN LAW, INC.

By:     /s/ Michael H. Boyamian
MICHAEL H. BOYAMIAN
ARMAND R. KIZIRIAN
Attorneys for Plaintiff Maynor
Mejia Lopez and all others
similarly situated

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION – Case No. 3:22-CV-08976-SI

**TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................. 1

II.   STATEMENT OF COMMON FACTS.................................................................. 2

     a.    XPO, Its Business and Operations in California, and the Proposed Class  2

     b.    XPO Subjects Contract Carriers to Common Agreements, Policies, and Practices ................................................................................................. 3

     c.    From Training to Monitoring: XPO Strictly Controls All Aspects of Work ................................................................................................... 6

     d.    Class Members Are Evaluated Based On Several Performance Metrics .. 8

     e.    Drivers Unlawfully Shoulder the Cost of Doing Business For XPO's Benefit And Suffer Wage Abuse ................................................................ 9

     f.    Plaintiff and the Class He Seeks to Represent. ....................................... 10

III.  ARGUMENT....................................................................................................... 12

     a.    Legal Standard for Class Certification..................................................... 12

     b.    The Proposed Class Satisfies the Requirements of Rule 23(a)................ 13

           1.    The Class Is So Numerous That Joinder is Impracticable ........... 13

           2.    Common Questions May Be Answered by Common Proof........ 13

           3.    Plaintiff's Claims Are Typical of the Class ................................ 14

           4.    Plaintiff Is An Adequate Representative under Rule 23(a)(4)..... 15

     c.    The Proposed Class Satisfies the Requirements of Rule 23(b)(3)........... 16

           5.    Common Questions Predominate Over Individual Questions..... 16

           6.    Common Questions Predominate as to Whether Drivers are Misclassified ............................................................................... 16

     d.    Common Questions Predominate as to Plaintiff's Wage and Hour Claims .......................................................................................................... 21

           7.    Indemnification of Expenses is a Common Question.................. 22

           8.    Unlawfully Deducted Drivers' Wages is a Common Question ... 22

           9.    Failure to Provide Meal & Rest Breaks is a Common Question . 23

           10.   Failure to Pay All Wages Earned, Including Overtime, is a Common Question ..................................................................... 24

1

11.    The Remaining Claims Turn Upon Drivers' Classification Status ..................................................................................................... 24

e.    A Class Action is the Superior Mechanism for Addressing the Claims .. 25

IV.    CONCLUSION ................................................................................................. 25

**TABLE OF AUTHORITIES**

**Federal Cases**

*Alexander v. FedEx Ground Package Sys.*, 765 F.3d 981 (9th Cir. 2014) .................... 19

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) .................................... 15, 16, 25

*Amgen Inc. v. Conn. Ret. Plans & Trusts Funds*, 568 U.S. 455 (2013)........................ 12

*Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975)............................................ 12

*Bowerman v. Field Asset Servs., Inc.*, 2015 U.S. Dist. LEXIS 37988 (N.D. Cal. Mar. 24, 2015) ...................................................................... 14

*Cardenas v. McLane Foodservices, Inc.*, 796 F. Supp. 2d 1246 (C.D. Cal. 2011)........ 24

*Chun-Hoon v. McKee Foods Corp.*, 2006 U.S. Dist. LEXIS 82029 (N.D. Cal. Oct. 31, 2006) ..................................................................... 12

*Dalton v. Lee Publ'ns, Inc.*, 270 F.R.D. 555 (S.D. Cal. 2010) ................................ 14, 15

*Dilts v. Penske Logistics, LLC*, 267 F.R.D. 625 (S.D. Cal. 2010) ................................ 22

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)........................................ 12

*Fleming v. Matco Tools Corp.*, 2021 U.S. Dist. LEXIS 33513 (N.D. Cal. Feb. 21, 2021) ....................................................................... 16, 25

*Frank v. Gold'n Plump Poultry, Inc.*, 2007 WL 2780504 (D. Minn. 2007)................. 23

*General Tel. Co. of the SW v. Falcon*, 457 U.S. 147 (1982)........................................ 15

*Guifu Li v. A Perfect Day Franchise, Inc.*, 2011 U.S. Dist. LEXIS 114821 (N.D. Cal. Oct. 5, 2011) ................................................................... 14

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998)......................... 13, 15, 16, 25

*In re Yahoo Mail Litig.*, 308 F.R.D. 577 (N.D. Cal. 2015) ........................................ 12

*James v. Uber Techs, Inc.*, 338 F.R.D. 123 (N.D. Cal. 2021)...................................... 25

*Jasper v. C.R. Eng., Inc.* (C.D. Cal. Aug. 30, 2012) 2012 U.S. Dist. LEXIS 186607... 23

*Johnson v. Serenity Transp., Inc.*, 2018 U. S. Dist. LEXIS 129241 (N.D. Cal. 2018).. 25

*Lee v. ABC Carpet & Home*, 236 F.R.D. 193 (S.D.N.Y. 2006).................................... 14

*Local Joint Executive Bd. v. Las Vegas Sands, Inc.*, 244 F.3d 1152 (9th Cir. 2001)..... 16

*Ludlow v. Flower Foods, Inc.*, 2022 U.S. Dist. LEXIS 118092 (S.D. Cal. July 5, 2022) ...................................................................... passim

*Madrigal v. Tommy Bahama Grp., Inc.*, 2011 U.S. Dist. LEXIS 157098, at *5 (C.D. Cal. June 27, 2011) ................................................................ 12

3

*Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012).....................................13

*Norris-Wilson v. Delta-T Grp., Inc.*, 270 F.R.D. 596 (S.D. Cal. 2010) ...................14, 15

*Phelps v. 3PD, Inc.*, 261 F.R.D. 548 (D.Or. 2009) ........................................................14

*Rannis v. Recchia*, 380 Fed. Appx. 646 (9th Cir. 2010) ................................................13

*Roman v. Jan-Pro Franchising Int'l, Inc.*, 342 F.R.D. 274 (N.D. Cal. 2022) ........ passim

*Sales v. Utd. Rd. Servs.*, 2022 U.S. Dist. LEXIS 93373 (N.D. Cal. Mar. 28, 2022)......14

Sales v. Utd. Rd. Servs., 2022 U.S. Dist. LEXIS 93373 (N.D. Cal. Mar. 28, 2022). .....12

*Smith v. Cardinal Logistics Mgmt. Corp.*, 2008 WL 4156364 (N.D. Cal. Sept. 5, 2008) ...............................................................................................................14, 15, 22

*Stuart v. Radioshack Corp.*, 2009 WL 281941 (N.D. Cal. Feb 5, 2009) .......................22

*Vazquez v. Jan-Pro Franchising Int'l, Inc.*, 986 F.3d 1106 (9th Cir. 2021)......17, 20, 21

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ...................................................13

**State Cases**

*Benton v. Telecom Network Specialists, Inc.*, 220 Cal.App.4th 701 (2013) ..................23

*Bluford v. Safeway Inc.*, 216 Cal. App. 4th 864 (2013) ..................................................24

*Bradley v. Networkers Int'l*, LLC, 211 Cal. App. 4th 1129 (2012) ...............................23

*Brinker Restaurant Corp. v. Superior Court*, 53 Ca1.4th 1004, 1040 (2012) ...............23

*Bufil v. Dollar Financial Group, Inc.*, 162 Cal.App.4th 1193 (2008) ...........................23

*Cicairos v. Summit Logistics, Inc.*, 133 Cal.App.4th 949 (2005) ..................................24

*Dynamex Operations West v. Superior Court*, 4 Cal. 5th 903 (2018) ......... 16, 17, 18, 20

*Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Ca1.4th 554 (2007) .....................................2

*Gonzalez v. Downtown LA Motors, LP*, 215 Cal. App. 4th 36 (2013)............................24

*S.G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal. 3d 341 (1989) ...............................................................................................................................16, 19

*See Vazquez v. Jan-Pro Franchising Int'l*, 10 Cal. 5th 944 (2021) ...............................17

**Statutes**

Cal. Lab. Code § 2775...............................................................................................16, 20

Cal. Lab. Code § 2802..........................................................................................................22

Fed R. Civ. P. 23(a).............................................................................................................13

4

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION – Case No. 3:22-CV-08976-SI

Fed. R. Civ. P. 23(b) ................................................................................................ 25

Fed. R. Civ. P. Rule 23(b)(3) ................................................................................... 16

Fed. R. Civ. P. Rule 23(g) ........................................................................................ 15

Labor Code § 221 ..................................................................................................... 22

Labor Code §§226.7 ................................................................................................. 23

Rule 23(a)(4) ............................................................................................................ 15

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION – Case No. 3:22-CV-08976-SI

## I.    <u>INTRODUCTION</u>

The case is before the Court on Plaintiff's Motion to Certify the Class and/or Sub-Classes under Fed. R. Civ. P. 23(a) and (b)(3), as Plaintiff satisfies all the procedural requirements for class treatment. Defendant XPO Last Mile, Inc. a/k/a RXO Last Mile, Inc. ("Defendant" or "XPO") has misclassified Plaintiff and the proposed class members as independent contractors, resulting in XPO's systematic violation of the protections afforded to employees by the California Labor Code ("Labor Code") and Industrial Welfare Commission's ("IWC") Wage Orders.

While XPO touts itself as the "largest provider of outsourced last mile transportation" in its public filings and acknowledges that its revenues are met when "performance obligations are satisfied as the shipments move," its Contract Carriers, Drivers, and Helpers (collectively "Drivers") are charged with the company's primary objective – the physical movement of freight for XPO's customers.  Whether Drivers are, in fact, misclassified as independent contractors is a question that is extremely well-suited for class treatment since it can be answered by applying the California Supreme Court's test for determining employment status, the "ABC test," to the Drivers and can be readily proven by common evidence. *See Dynamex Operations W. v. Superior Court*, 4 Cal. 5th 903, 957 (2018) (outlining the factors for distinguishing between independent contractors and employees); Cal. Lab. Code § 2775(b)(1)(a)-(c) (codifying the *Dynamex* ABC test). This Court and others throughout the Ninth Circuit have repeatedly certified classes where class members' employment status and the defendant's resulting liability for Labor Code claims were to be determined by applying the ABC test, finding that this question predominated over any individualized issues.  This case is no different.

XPO requires Drivers, in particular Contract Carriers, to assent to its Delivery Service Agreement, which unilaterally sets the terms and dictates that all Drivers, including such secondary Drivers and Helpers, are deemed independent contractors.  XPO imposes strict regulations on Drivers' manner of performing their work, at the risk of termination. Because the question of whether XPO misclassified the Drivers as independent contractors, which

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION – Case No. 3:22-CV-08976-SI

predominates over each of the alleged claims, is answerable by common evidence, certification of each claim is warranted.

## II.    STATEMENT OF COMMON FACTS

a.    *XPO, Its Business and Operations in California, and the Proposed Class*

Defendant XPO Last Mile, Inc. a/k/a RXO Last Mile, Inc.[1] is a logistics company that provides retailers such as Costco, Macy's, Best Buy, and others, with "managed transportation services" to make deliveries of heavy goods purchased by XPO's customers. *See* 10-K Report attached as Exh. 5 to Plaintiff's Compendium of Evidence ("COE") (RXO_0000780) In its public offerings, XPO acknowledges that "[s]hippers create demand for our service, and we place their freight with qualified independent carriers using our technology," and recognizes that its revenues are met when "performance obligations are satisfied as the shipments move." *Id*. (RXO_0000831) When testifying about the contracts XPO has in place with retail customers, XPO's Vice President of Strategic Accounts confirmed that Defendant's fulfillment of its contractual obligations rest solely on the output of Class Members:

> "Q: Without contract carriers and their delivery teams, there wouldn't be one way to know whether RXO would be hitting that target and getting a financial reward or the opposite, getting hit with a financial penalty for not meeting that threshold or target?
>
> A: I believe the answer is **yes. Deliveries have to be performed**."[2]

As a more general matter, XPO's PMK confirmed that Drivers are an integral part of the company and that their work constitutes the bedrock of XPO's business:

> "Q: As a more general matter, am I correct that the services that RXO provides to its retail customers, they use the drivers classified as independent contractors pursuant to those contracts RXO has in place with those retail customers? Correct?

[1] On or about November 1, 2022, XPO changed its corporate name to RXO Last Mile, Inc. *See* 10-K Report as Exhibit 4. For simplicity and consistency with the pleadings filed before this name change, this motion refers to Defendant simply as "XPO."
[2] *See* Deposition of Fernando Rabel, taken on February 12, 2026 ("PMK Depo"), at 113:22-114:6, attached as Exh. 2 to COE. XPO produced Mr. Rabel as its Person Most Knowledgeable (PMK) witness on a variety of subjects relating to the job duties and requirements of the drivers, policies and procedures of XPO, and its California operations. *Id*. at 7:12-17, 17:3-18:2, 22:1-23:21; 54:12-24, 72:1-11; *see also* Notice of Deposition attached as Exh. 4 to COE. Mr. Rabel is the Vice President of Strategic Accounts for XPO and has been with the company for approximately 25 years working in several roles and capacities. *Id*. at 14:1-16:2. Mr. Rabel also confirmed the same in an example involving XPO's client Peloton. PMK Depo at 50:7-51:3, Exh. 2 of COE; *See also* Exh. 23 of COE.

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION – Case No. 3:22-CV-08976-SI

A: I'm not sure of the exact language, **but directionally, yes**."[3]

XPO has identified 2,485 delivery personnel (1,251 Drivers, 652 Contract Carriers, and 582 Helpers) who made deliveries for XPO in California during the time period between April 29, 2018 (the start of the liability period in this case) and November 19, 2025 (the date of XPO's interrogatory response providing the information). Kizirian Decl., ¶ 8. In California, these drivers work out of either a "network hub" of XPO or a "dedicated business" of XPO.[4] A "network hub" is a building that XPO leases, from where it services its various retail customers. *Id.* At the hub, XPO comingles freight on the delivery trucks from its different retail customers, and then the XPO driver delivers the products to the end recipients according to the delivery routes XPO provides. *Id.* There are four network hubs in California: Ontario, Fresno, San Francisco, and San Diego. A driver working out of one of these hubs is likely to have delivered products for each of XPO's customers serviced at the hub. *Id.* at 42:21-43:23. XPO's "dedicated business" is where XPO operates off the back of its customer's facility (e.g. a Macy's facility or Costco warehouse), such that the XPO driver delivers products only from one particular XPO customer on any given route. *Id.* at 18:16-25; 19:25-21:1. XPO's PMK testified that any given driver can make deliveries for multiple retail customers of XPO, and that a Delivery Driver can bounce from one account to the next. *Id.* at 42:21-43:23; 145:8-17. XPO's corporate designee conceded that the company does not alter its expectations for Class Members based on the retail client being serviced. *Id* at 196:9-16.

Consistent with XPO's own description, Plaintiff has submitted declarations from current and former drivers who have worked for XPO throughout California, delivering products for different retail customers of XPO. *See* Declarations of Putative Class Members ("Class Member Decls.") at ¶ 4, Exhs. 26-61 of COE. They all attest to the same policies and procedures. *See generally* Class Member Decls., Exhs. 26-61.

**b.    *XPO Subjects Contract Carriers to Common Agreements, Policies, and Practices***

XPO maintains a standardized onboarding process for recruiting and bringing on

---

[3] PMK Depo at 116:21-117:3, Exh. 2 to COE.
[4] PMK Depo at 18:3-19:24, 76:23-77:2, Exh. 2 to COE.

3

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION – Case No. 3:22-CV-08976-SI

qualified Drivers. *See* PMK Depo at 52:2-13, Exh. 2 of COE. It advertises the specific details of the desired personnel to the general market in order service its customers. *Id*. at 64:1-67:7; *see also* Job Postings as Exh. 6 to COE. XPO's PMK testified that a prospective driver must pass a background check consisting of a social security verification, criminal history check, and a urine analysis. *Id*. at 202:16-203:6.[5] XPO retains the final determination to disqualify a driver if they fail the prerequisite background criteria – and even outright termination during the entirety of the service period. *Id*. at 197:18-198:23; *see also* Exh. 10 of COE. XPO also possesses minimum requirements to successfully onboard with Defendant consisting of an established business, a motor carrier, and being registered with Department of Transportation. *Id*. at 52:14-53:4.

XPO additionally – and uniformly – requires Contract Carriers to agree to a form contract identified as a "Delivery Service Agreement." (hereinafter "DSA") XPO's PMK admits that the terms of the DSA are "pretty standard." *Id*. at 42:3-7.  The DSA is a standardized document that dictates the compensation terms and other work requirements that all Drivers must follow. *See* Exhs 11-13 of COE; *see also* PMK Depo at 153:1-4, 154:15-18. For example, the DSA mandates use of handheld mobile devices and mobile applications to document progress and completion of deliveries and that payment for such deliveries is contingent on such use. *See* §3.4 of DSA, Exhs. 11-13 of COE; *see also* PMK Depo at 162:11-163:16. The DSA also requires that the Contract Carrier will, at his or her own expense, acquire all equipment, vehicles, and tools to perform the very service XPO has contracted to do with its retail customers. *Id*. at §3.3. The DSA also instructs the submission of a $5,000 cash bond or the maintenance of a fund for circumstances where the contract carrier is strictly liable for all such damages. *Id*. at §6.1.[6]  At some point during the class period, the DSA even required class members to agree to what is the functional equivalent of a "non-compete" clause which was later removed in subsequent versions. *See* § 29 of Exh. 12 titled "No Back

---

[5] *See* also Exhs. 17 & 18 of COE.
[6] "Q: But this idea that a contract carrier has to put in a cash bond or maintain fund, whether it's before, after or during, there was such a practice in place in California for all contract carriers, correct? A: Yes." PMK Depo at 167:6-168:4, Exh. 2 to COE.

Solicitation" *compared with* DSA Exhs. 11, 13.[7]

In terms of the compensation plan of the DSA, whether it's a day rate, mileage rate, or stop rate, XPO's PMK testified that the rates for the delivery are set exclusively by Defendant and the retail client, and that Class Member have <u>zero</u> involvement. *See* PMK Depo at 33:2-17, 54:25-55:18.[8] Above all, pursuant to the DSA, XPO classifies *all* Contract Carriers as independent contractors and has done so throughout the Class Period. *See* §4 of DSA, Exhs 11-13. Through the DSA, XPO also maintains the authority to exercise control over the secondary Drivers and Helpers assigned to perform the routes for XPO's customers. The DSA directs that such Drivers and Helpers are "screened and qualified in accordance with the same standards as Contract Carrier was screened and qualified," and "in conformance with all requirements as may be communicated by RXO Last Mile from time to time." *See* §5(a) of DSA, Exhs. 11-13.

Once given a unique ID, Contract Carriers, Drivers, and Helpers are then issued badges in order to perform the work on behalf of XPO for its retail customers. *See* PMK Depo at 77:24-78:17, 200:2-12, 203:7-16, Exh. 2 to COE; *see also* Exh. 18 of COE (RXO_0000444). It is beyond dispute that all Putative Class Members perform work that is integral to the business of XPO – that is, they all perform the deliveries that XPO contracts with its various retail customers to provide. *See* PMK Depo at 47:7-15; 70:2-24, 102:4-103:5, 113:22-114:6, 116:21-117:3, 140:5-141:13, 143:13-22; *see also* Exhs. 5 & 24.

None of the drivers enter into their own contracts or arrangements with the retail customers whose product is being delivered. *See* ¶¶5-6 of Class Member Decls., Exhs. 26-59. None operate their own warehouses or communicate with the end-purchasers of the products that are being delivered either. *Id.*; *see also* PMK Depo at 60:7-14 . Nor do any of the drivers negotiate with XPO's customers regarding the routes, payment terms, or anything else concerning the way in which the product is delivered or the services are provided. PMK Depo at 38:21-41:1, 61:7-14, 126:11-18, Exh 2 to COE.

[7] *See* PMK Depo at 155:5-156:4, 157:3-159:25, Exh. 2 to COE.
[8] *See also* Rate Schedules, Exh. 22 to COE.

5

c.    *From Training to Monitoring: XPO Strictly Controls All Aspects of Work*

XPO provides training to Drivers on a near-daily basis, ranging from daily "stand up meetings," to standardized development programs to ensure that they perform their work in accordance with uniform company expectations.  *See* Exh. 8 of COE ("RXO Deliver – User Guide: Simple Tips for a Perfect Route.")  The stand-up morning meetings, including a role-playing session in which XPO managers would have drivers simulate a customer interaction. *See* ¶ 10 of Class Member Decls., Exhs. 27-61. XPO's PMK described this as a "fun interactive sharing of best practices," which Class Members testify occur on a daily basis, and that the meetings would also cover subjects such as new product lines, installation techniques, improving customer service, and review of performance metrics.  *Id*.; *see also* PMK Depo at 78:23-79:25, 196:18-197:12, Exh. 2 to COE. Such daily meetings are also used to discipline or threaten discipline for Drivers not performing up to company expectations, and hand out routes for the day. *Id*. Company training and monitoring of the Class Members extends beyond the stand-up meetings.  Indeed, XPO has a common development program that provides a step-by-step instruction on how to perform deliveries using Defendant's mandated devices and applications. *See* Exh. 8 of COE.  A review of Exh. 8 showcases instructions on "how to perform a delivery," "what to do if the customer is not available," "how to view the details of your route." Despite XPO's PMK claiming that Defendant provides no training to Drivers, XPO has produced a barrage of documents demonstrating control to every facet of delivery, for example, in how to install televisions and appliances. *See* Exhs. 8, 20, 21, 25 of COE. Class Members collectively describe in unison strict adherence to Defendant's directives on fulfilling deliveries. *See also* ¶¶ 11-17 of Class Member Decls., Exhs. 26-61.

As a logistics company that is in the business of arranging for the efficient delivery of freight, it is not surprising that XPO, rather than the individual drivers, retains control over how the routes are arranged, assigned, and managed. *See* PMK Depo at 54:25-55:18.[9]  The

---

[9] Internal XPO communications lay bare the reality of XPO's absolute operational control over its allegedly independent contractors and their equipment. For instance, when Plaintiff Maynor Mejia sought to acquire a truck, XPO's General Manager dictated exactly where and

Connect LM training transcript (which is a summary of the instructional video provided to XPO staff) confirms that XPO exercises absolute, centralized control over the 'means and manner' of delivery by utilizing proprietary software to sequence and lock routes before a carrier is even permitted to accept the assignment. *See* Training Transcript as Exh. 20 to COE.[10]  This internal documentation proves that the creation and management of delivery routes is a strictly internal function performed by XPO employees, further establishing that Drivers are performing the essential work in the usual course of XPO's business. Consequently, XPO's own training materials refute any claim of contractor independence by demonstrating that Class Members have no discretion over the fundamental logistics of their daily work. In this respect, XPO assigns delivery routes to the Drivers in documents called manifests, which contain the prearranged delivery locations, product orders, and delivery times for the routes. *See* Exh. 20; *see also* ¶¶ 11-12 of Class Member Decls., Exhs. 26-59. In deposition, XPO confirmed that none of the Drivers choose the stops or delivery times on the routes assigned to them. PMK Depo at 54:25-55:18, fn. 7 supra. To the contrary, XPO's expectation is that the routes are performed in the order they are tendered to Class Members. *Id*. at 56:3-57:2, 60:15-24, 94:13-97:8, 107:8-13; *see also* Exh. 8 to COE. XPO likewise asserts an "expectation" to obtain a customer signature when delivering the freight. *Id*. at 103:17-104:14.

XPO also monitors the Drivers throughout the day and its managers make supplemental assignments directly to the drivers once they are on route. *See* ¶¶ 14-17 of Class Member Decls, Exhs. 26-61. XPO's PMK stated that the expectation for Drivers is to utilize the devices and software to record the progress of their deliveries. PMK Depo at 61:15-22,

---

how that asset would be deployed, expressly assuring a Market Vice President, "I made it clear this truck will be going to Macys and will need to stay there." This illustrates XPO's pervasive right to control the means and manner of the work.  *See* Exh. 7 to COE.

[10] *See also* portions of the deposition transcript of Jonathan Turner, a PMK designated in the previous lawsuit for *Kramer v. XPO*, in which Mr. Turner describes the information that is provided to the delivery teams, noting that they receive details about the items being picked up or delivered, specific delivery notes (such as instructions to "go around back and knock twice"), and the time window that was promised to the consumer. *See* Exh. 9 of COE (RXO_0001210-1211); *see also* PMK Depo at 126:11-18.

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION – Case No. 3:22-CV-08976-SI

162:11-163:16. Through the devices XPO requires Drivers to utilize, XPO maintains the capability to monitor the precise movements of each of its delivery teams through GPS tracking. *See* ¶¶ 14-15 of Class Member Decls, Exhs. 26-61; *see also* §§3.3 & 3.4 of DSA, Exhs. 11-13.  In turn, through its headquarters in Marietta, Georgia or through one of the "network hubs," XPO retains the authority to call the Drivers throughout the day to change or add delivery stops to the routes. *Id*.; PMK Depo at 90:24-91:13, 92:24-93:19. Drivers report that they must comply with these directives even if it means traveling across town, making them late for other deliveries, or working more hours without overtime pay. *See* ¶¶ 14-15 of Class Member Decls, Exhs. 26-61.  To fulfill the customer service expectations of its retail customers, XPO exercises further control over the Drivers by making them pay the costs of any loss or damage to items that occurs during the course of the delivery. *Id*. at ¶ 28; *see also* Self-Employment Business Ledger for ABC Logistics LLC, Exh. 14 of COE.

Further, Defendant retains sole and absolute discretion as to whether it will continue assigning Class Members any deliveries, or whether it will cut-off Drivers from future deliveries. *See* ¶¶ 16-17, 22 of Class Member Decls., Exhs. 26-59.  Indeed, XPO's PMK previously testified that altering the distribution of workload to delivery teams is an effective tool that Defendant can utilize to force Drivers to comply with XPO's directives. *See* Exh. 19 of COE; *see also* PMK Depo at 205:7-208:15. Defendant thus retains the control to effectively "fire" the Drivers by freezing them out of any deliveries.  XPO's PMK remarkably acknowledged this point at deposition. PMK Depo at 208:16-22.

**d.     *Class Members Are Evaluated Based On Several Performance Metrics***

Drivers, including Plaintiff, are also evaluated based on several metrics imposed on them by XPO.  Drivers are evaluated on a comprehensive, multi-metric tracking system: XPO utilizes an automated survey program called "Voice of the Customer" ("VOC") that measures end-consumer satisfaction following a delivery. PMK Depo at 126:25-128:16, 129:1-11. If a delivery team receives an unsatisfactory score or negative feedback, XPO management is automatically notified. *Id*. at 131:11-25. XPO additionally monitors whether the delivery teams are successfully executing their deliveries within the predetermined time windows

8

established by Defendant and its retail clients. *Id*. Alongside VOC scores, XPO heavily relies on a carrier's route completion rate, actively scrutinizing whether a Driver completes all assigned stops or brings undelivered freight back to the warehouse. *Id*. at 131:11-133:3, 134:3-135:15; *See also* ¶¶ 13-15 of Class Member Decls., Exhs. 26-61.  All delivery times were scanned and recorded on XPO's proprietary software which ultimately was used to generate performance-based grades for delivery teams. *Id*. These individual performance indicators are aggregated to create performance scorecards, allowing XPO to continually monitor trends, audit driver performance, and ensure their standards are being met – especially with their customers. PMK Depo at 126:25-128:16. The emphasis on efficient performance by Drivers is emphasized through the "Carrier Settlement and Routing Playbook,"  an internal RXO corporate manual that establishes a strict governance structure that instructs managers on how to communicate with carriers, monitor their daily operations, and track their work quality using mandatory weekly scorecards. *See* Exh. 21 of COE. This is so because as XPO's PMK testified, it is not uncommon for its contracts with customers to contain financial incentives or penalties that is entirely based on the performance of Drivers. PMK Depo at 109:15-112:2.

e.  ***Drivers Unlawfully Shoulder the Cost of Doing Business for XPO's Benefit And Suffer Wage Abuse***

The DSA provides that Drivers will pay for all costs incurred in connection with performing the work (e.g. fuel, permits, tolls, etc.), and that they will be responsible for loss or damage of the merchandise they are delivering, regardless of fault. *See* §§7-8 of DSA, Exhs. 11-13. But XPO's reach is far broader.  XPO treats the putative class as a supplementary revenue stream by deducting standardized "CMS processing" and "reconciliation" fees from their weekly earnings. *See* PMK Depo at 86:17-88:12, 176:2-177, Exh. 2 of COE; *see also* Exh. 14 of COE. Most egregiously, when a customer alleges property damage, XPO not only shifts the entire cost of the damage onto the Class Member, but also slaps the Delivery Driver with an arbitrary 10% "processing fee" penalty on top of the damage charge. *See* PMK Depo at 178:13-179:24, Exh. 2 of COE; *see also* Exh. 14 & 15 of COE. Despite classifying drivers as independent contractors, XPO strictly enforces corporate appearance standards. In one

9

scenario, a $286.44 deduction for a "Jocoba uniform" was withheld directly from Mr. Mejia settlement. *See* Exh. 14 of COE; *see also* ¶¶ 18, 23-30 of Class Member Decls., Exhs. 26-61; PMK Depo at 72:17-73:6, 74:6-14, Exh 2 of COE.

XPO forces class members to shoulder the financial burden of the company's corporate risk management. Drivers are required to maintain specific, high-limit "standard" liability insurance policies ensuring that XPO's own business risks are subsidized by the workers' wages. *See* Exh. 16 of COE; *see also* PMK Depo at 171:7-19, 186:7-14, 187:12-18. XPO does not have policies or procedures for providing off-duty meal periods of at least 30 minutes, by each five hours of work, or rest periods of at least 10 minutes for every four hours of work or major fraction thereof, or even instructing Drivers that they have the opportunity to take such breaks. *See* PMK Depo at 150:21-151:19, Exh. 2 of COE; *see also* ¶¶ 31-32 of Class Member Decls, Exhs. 26-61. Moreover, the Drivers themselves consistently report that they did not have an opportunity to take off-duty meal or rest periods and that they regularly had to work upwards of 12-14 hours without a break of any kind (much less one that is off-duty). The conditions are so egregious, that some Drivers and Helpers actually have to go to bathroom in a container they keep in their truck because they just are not provided the opportunity to stop.

**f.     *Plaintiff and the Class He Seeks to Represent.***

Plaintiff Maynor Mejia's experience exemplifies XPO's systemic misclassification of its delivery workforce. Prior to forming his own business, Mejia worked as a delivery driver and helper for his brother's logistics company, performing deliveries for XPO. Deposition of Maynor Mejia ("Mejia Depo") at 21:16-25, 23:2-7, Exh. 3 of COE. In 2018, an XPO manager, offered Mejia direct work but expressly required him to form an LLC, obtain permits, a DOT number, and a Certificate of Insurance as a strict condition of taking on routes *Id*. at 33:2-17, 38:2-19. To comply with XPO's demands, Mejia formed ABC Logistics LLC and signed XPO's standard Delivery Service Agreement (DSA) in June 2018 - a take-it-or-leave-it contract he signed quickly and as part of a whole package of documents presented to him by XPO just so he could begin working. *Id*. at 31:18-20, 122:16-23, 129:1-3.

From the moment Mejia arrived at the warehouse, XPO controlled the manner and

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION – Case No. 3:22-CV-08976-SI

means of Plaintiff's daily work. Plaintiff was required to report to the XPO warehouse in Union City each morning to load appliances according to a manifest generated by XPO. *Id*. at 25:10-14, 136:3-13.  Before heading out, XPO managers required workers to attend mandatory morning "stand-up meetings" where they dictated safety protocols, delivery windows, paperwork requirements, and metrics for securing 5-star customer surveys. *Id*. at 156:5-15, 157:1-12.

Once on the road, XPO's rigid control continued. Mejia was required to adhere to strict delivery windows, execute 30-minute pre-arrival calls to customers, and follow specific client-mandated protocols, such as rolling out a red carpet for Macy's deliveries. *Id*. at 84:10-17, 109:11-20, 112:8-20, 126:4-6. The workload dictated by XPO's manifests was overwhelming; during the pandemic, Mejia regularly worked 12 to 13 hours a day, six days a week, completing up to 24 deliveries per route. *Id*. at 149:21-150:4, 151:8-10, 152:7-18.

XPO also exercised absolute control over the appearance and composition of Mejia's delivery teams. XPO mandated the use of specific equipment, namely 26-foot box trucks with lift gates. *Id*. at 59:17-19. To the public, Mejia and his workers were indistinguishable from XPO employees. XPO required them to maintain a professional appearance by wearing uniforms consisting of XPO-provided polo shirts, black pants, black shoes – "color schemes" as XPO's PMK put it – and XPO identification badges worn visibly on their arms while inside customers' homes. *Id*. at 80:17-81:3, 194:12-23. Furthermore, XPO strictly vetted and controlled Mejia's personnel. XPO required mandatory background checks and drug tests before he could hire any helpers or drivers. *Id*. at 73:18-20, 218:13-17, and XPO managers retained the authority to dictate which specific drivers were permitted to work on heavier routes. *Id*. at 74:14-75:19, 76:11-17. The experiences of Class Members are in accord. *See generally* Class Member Decls., Exh. 26-61.

The economic realities of the relationship further demonstrate XPO's complete control over Plaintiff.  XPO dictated Plaintiff's compensation structure, unilaterally shifting it from a flat daily rate to an itemized per-delivery invoice, and later reverting back to a flat rate. *Id*. at 175:8-21, 176:20-178:6, 186:10-187:11. XPO also exercised unilateral control over

11

Mejia's earnings by forcing deductions from his pay to cover customer gift cards or damage claims, often without his prior input or an independent investigation. *Id*. at 98:16-99:12, 173:16-24, 204:8-17. Ultimately, XPO's absolute power over Mejia's livelihood was demonstrated when XPO manager abruptly terminated his contract while he was in the middle of a delivery route in April 2022. Tellingly, this termination occurred shortly after Plaintiff requested a route rate increase to cover rising fuel costs – a request XPO firmly rejected.

### III.    ARGUMENT

#### a.    *Legal Standard for Class Certification*

Courts have "broad discretion to determine whether a class should be certified." *Madrigal v. Tommy Bahama Grp., Inc.*, 2011 U.S. Dist. LEXIS 157098, at *5 (C.D. Cal. June 27, 2011). When a court considers a motion for class certification, "the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) (original quotations omitted); *see In re Yahoo Mail Litig.*, 308 F.R.D. 577, 586 (N.D. Cal. 2015) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.") (quoting *Amgen Inc. v. Conn. Ret. Plans & Trusts Funds*, 568 U.S. 455, 465-66 (2013)). In answering this question, "[t]he court is bound to take the substantive allegations of the complaint as true." *Blackie v. Barrack*, 524 F.2d 891, 901, n.17 (9th Cir. 1975). Further, "the court must only determine if the plaintiffs have proffered enough evidence to meet the requirements of FRCP 23, not weigh competing evidence." *Chun-Hoon v. McKee Foods Corp.*, 2006 U.S. Dist. LEXIS 82029, at *11 (N.D. Cal. Oct. 31, 2006).

"Class certification under Rule 23 is a two-step process." *Sales v. Utd. Rd. Servs.*, 2022 U.S. Dist. LEXIS 93373, at *2 (N.D. Cal. Mar. 28, 2022). During the initial step, the reviewing court must examine whether the numerosity, commonality, typicality, and adequacy prerequisites of Rule 23(a) are met. *Id*. at *2-3. The second step requires that "one of the bases for certification in Rule 23(b) is met." *Id*. at *3. Here, as detailed below, Plaintiff satisfies both steps of the class certification process as the putative class meets all the prerequisites of Rule 23(a) and because common questions of the class predominate, thus

rendering a class action the superior method for resolving the case. Accordingly, class certification is proper.

**b.      *The Proposed Class Satisfies the Requirements of Rule 23(a)***

Here, (1) the size of the proposed class is so numerous that joinder is impracticable, (2) common questions regarding the class may be answered by common proof, (3) Plaintiff's claims are typical of the class, and (4) Plaintiff and class counsel will adequately represent the class.  Fed R. Civ. P. 23(a)(1)-(4).

1.      <u>The Class Is So Numerous That Joinder is Impracticable</u>

XPO has identified 2,485 class members as of November 18, 2025. Kizirian Decl., ¶ 8. This easily satisfies numerosity under Fed. R. Civ. P. 23(a)(1). *See Rannis v. Recchia*, 380 Fed. Appx. 646, 651 (9th Cir. 2010) (numerosity generally satisfied by 40 members).

2.      <u>Common Questions May Be Answered by Common Proof</u>

Rule 23(a) next requires plaintiffs to show one or more questions of law or fact common to the class.  Fed. R. Civ. P. 23(a)(2). Plaintiff satisfies this requirement by demonstrating the existence of a "common contention" that is capable of resolution in "one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *accord Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012). Courts construe the commonality requirement "permissively" such that "[a]ll questions of fact and law need not be common to satisfy the rule." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). Rather, "[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Id*. Indeed, "commonality only requires a single significant question of law or fact." *Mazza*, 666 F.3d at 589; *see Dukes*, 564 U.S. at 359 (declaring that "for purposes of  Rule 23(a)(2) even a single common question will do") (internal quotations and alterations omitted).

Courts throughout the Ninth Circuit have concluded that "commonality is met when the proposed class of plaintiffs asserts that class members were improperly classified as independent contractors instead of employees." *Guifu Li v. A Perfect Day Franchise, Inc.*, 2011 U.S. Dist. LEXIS 114821, at *22 (N.D. Cal. Oct. 5, 2011); *see, e.g., Sales v. Utd. Rd.*

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION – Case No. 3:22-CV-08976-SI

*Servs.*, 2022 U.S. Dist. LEXIS 93373, at *5 (N.D. Cal. Mar. 28, 2022) ("Plaintiffs meet the commonality requirement because the putative class members' claims depend upon the common question of whether [defendant-employer] misclassified the putative class members as independent contractors."); *Norris-Wilson v. Delta-T Grp., Inc.*, 270 F.R.D. 596, 604 (S.D. Cal. 2010) (concluding that commonality was satisfied where class members were uniformly hired and classified by defendant as independent contractors pursuant to the same agreement).[11]

Here, the claims of the putative class raise common questions that may be answered by common proof, easily satisfying the commonality requirement. Each of the Labor Code claims Plaintiff advances on behalf of the proposed class derive from his preeminent allegation that XPO uniformly misclassified him and other Drivers as independent contractors. The question of whether Defendant misclassified Drivers as independent contractors is well-suited for class treatment since Drivers were subjected to common agreements, policies, and procedures – both official and unofficial, performed the same or substantially similar job duties, and were compensated invariably and, thus, can be resolved for the entire class by common proof. *See Bowerman v. Field Asset Servs., Inc.*, 2015 U.S. Dist. LEXIS 37988 (N.D. Cal. Mar. 24, 2015) (holding "whether putative class members were misclassified under California law as independent contractors" was a question capable of common resolution); *Ludlow v. Flower Foods, Inc.*, 2022 U.S. Dist. LEXIS 118092, at *18-21 (S.D. Cal. July 5, 2022) (certifying a class upon finding the "common question at the heart of the action" was "whether Defendants misclassified its distributors as independent contractors instead of employees").

3.    Plaintiff's Claims Are Typical of the Class

The Rule 23(a) (3) typicality standard is "permissive." *Hanlon*, 150 F.3d at 1020. The

---

[11] *See also Dalton v. Lee Publ'ns, Inc.*, 270 F.R.D. 555, 559 (S.D. Cal. 2010) (commonality satisfied by "the one central [question] to this case: whether Defendant improperly characterized plaintiffs as independent contractors instead of employees."); *Phelps v. 3PD, Inc.*, 261 F.R.D. 548, 557 (D.Or. 2009)(same); *Smith v. Cardinal Logistics Mgmt. Corp.*, 2008 WL 4156364, at *5 (N.D. Cal. Sept. 5, 2008) (same); *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 203 (S.D.N.Y. 2006) (same).

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION – Case No. 3:22-CV-08976-SI

named plaintiffs are typical if they are "part of the class and possess the same interest and suffer the same injury as the class members." *General Tel. Co. of the SW v. Falcon*, 457 U.S. 147, 156 (1982) (internal quotation omitted). "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. As demonstrated by his declaration, the named plaintiff here performed the same kind of delivery services, under the same standardized "Delivery Services Agreement" and was subject to the same uniform policies and practices, as the other Drivers in the putative class.  Even prior to becoming a Contract Carrier, Plaintiff also worked as a secondary driver during the Class Period, thus sharing the same experience as those who did not enter into a DSA.  As in other independent contractor misclassification cases, plaintiff satisfies typicality here. *See Norris-Wilson*, 270 F.R.D. at 604; *Dalton*, 270 F.R.D. at 559-60; *Smith*, 2008 WL 4156364, at *5.

> 4.      Plaintiff Is an Adequate Representative under Rule 23(a)(4)

The adequacy requirement is satisfied where, as here, the class representative: 1) has common, and not antagonistic, interests with unnamed class members, and 2) will vigorously prosecute the interests of the class through qualified counsel. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *Hanlon*, 150 F.3d at 1021. As shown above, the named plaintiff shares common injuries with the class and is typical of all class members. He has participated actively in the case, including sitting for deposition, responding to written discovery, and generally staying in touch with counsel as the litigation proceeds. Mejia Decl. at ¶ 38. Additionally, Plaintiff's counsel are highly experienced in prosecuting complex class actions, including wage and hour class actions in the last-mile, independent contractor misclassification context. *See* Declaration of Michael H. Boyamian, Exh. 1 to COE ("Boyamian Decl."), ¶¶ 2-10; Declaration of Armand R. Kizirian, Exh. 62 to COE ("Kizirian Decl."), ¶¶ 2-9. For this reason, Plaintiff's counsel also should be appointed as class counsel under Fed. R. Civ. P. Rule 23(g)(1) & (4).

////

////

15

**c.    *The Proposed Class Satisfies the Requirements of Rule 23(b)(3)***

5.    Common Questions Predominate Over Individual Questions

The Rule 23(b)(3) predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is a clear justification for handling the dispute on a representative rather than on an individual basis." *Local Joint Executive Bd. v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001). The presence of individual issues does not preclude certification. *Id*. at 1163 (reversing denial of certification on predominance grounds despite presence of individualized issues). Rather, the predominance inquiry "focuses on the relationship between the common and individual issues." *Hanlon*, 150 F.3d at 1022. Here, the predominance test is satisfied because significant aspects of the case (indeed resolution-driving issues) can be resolved through evidence common to the drivers as a class.

6.    Common Questions Predominate as to Whether Drivers are Misclassified

The core question of whether XPO misclassified its Drivers as independent contractors can be readily adjudicated for all class members and answered using common evidence by applying the "ABC test" established by the California Supreme Court in *Dynamex Operations West v. Superior Court*, 4 Cal. 5th 903 (2018), and codified by the California Legislature in Labor Code section 2775. *See, e.g., Roman v. Jan-Pro Franchising Int'l, Inc.*, 342 F.R.D. 274, 294-96 (N.D. Cal. 2022) (certifying a misclassification claim brought pursuant to *Dynamex*); *Fleming v. Matco Tools Corp.*, 2021 U.S. Dist. LEXIS 33513, at *15-16 (N.D. Cal. Feb. 21, 2021) (discussing the history of the ABC test and finding common questions predominated under the test when analyzing whether employees were misclassified). Under the ABC test, which replaced the multi-factor test established in *S.G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal. 3d 341 (1989), for distinguishing between employees and independent contractors, a worker is presumptively an employee. The hiring entity must prove otherwise.  *Dynamex*, 4 Cal. 5th at 957; Cal. Lab. Code § 2775(b)(1). The test is conjunctive - the hiring entity's failure to establish *any* of the three factors precludes

finding that the worker is an independent contractor:

"(A) that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact; and (B) that the worker performs work that is outside the usual course of the hiring entity's business; **and** (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed."

*Dynamex*, 4 Cal. 5th at 957 (emphasis added); Cal. Lab. Code § 2775(b)(1)(a)-(c); *see Ludlow*, 2022 U.S. Dist. LEXIS 118092, at *9-10 ("[b]ecause the ABC Test requires *all* three prongs to be met before a worker can be deemed an independent contractor, a class need only establish that a hiring entity failed one prong in order to prove its misclassification claim"). A hiring entity cannot unilaterally determine a worker's status by labeling the worker as an "independent contractor" or requiring the worker, as a condition of hiring, to enter a contract designating them an independent contractor. *Dynamex*, 4 Cal. 5th at 962. The test is retroactive; it may apply to workers who were misclassified before *Dynamex*. *See Vazquez v. Jan-Pro Franchising Int'l*, 10 Cal. 5th 944, 948 (2021) ("[W]e conclude that *Dynamex* does apply retroactively."); *accord Vazquez v. Jan-Pro Franchising Int'l, Inc.*, 986 F.3d 1106, 1117 (9th Cir. 2021) (same).

Courts in this district, and other courts throughout the Ninth Circuit, have repeatedly resolved that application of the ABC test to determine whether employees were misclassified as independent contractors lends itself to class-wide treatment and have regularly certified such claims. For instance, in *Roman v. Jan-Pro Franchising International, Inc.*, the Hon. William Aslup held that common questions predominated as to the classification of workers under the ABC Test – specifically Prong B of the test – where a company classified all putative class members as independent contractors, provided class members with the same standard agreements, and subjected class members to common policies that would "help to adjudicate the misclassification question." *Roman*, 342 F.R.D. at 295. The Court further observed that the defendant's statements on its website and advertisements regarding what business it claimed to be in and whether the putative class members' work was necessary was likewise susceptible to common proof since all putative class members performed the same work for defendant. *Id*. at 295-96. Based solely on the common questions that predominated

Prong B of the ABC test, the Court ultimately concluded that certification of the misclassification claim was proper. *Id.* at 295 ("Whether Prong A or Prong C is susceptible to common proof does not affect class certification here."); *see also Dynamex*, 4 Cal. 5th at 966 ("Because each part of the ABC test may be independently determinative of the employee or contractor question, our conclusion that there is a sufficient commonality of interest under part B of the ABC test is sufficient in itself to support the trial court's class certification order.").

In *Ludlow v. Flower Foods, Inc.*, the resolution of the "misclassification claim central to this proposed class" under the ABC test was "susceptible to common, class-wide proof regarding the [class members'] role in Defendants' overall business structure and Defendants' level of control over the [class members]." *Ludlow*, 2022 U.S. Dist. LEXIS 118092, at *19-22. The court noted that the question of whether class members performed work outside the course of the defendant-employer's course of business under Prong B "alone [would] be sufficient to establish Plaintiff's misclassification claim" and would be "determined in large part by common evidence across the class," including the defendants' corporate filings regarding their business operations, testimony from corporate representatives, and the standard agreements signed by class members. *Id.* at *19-20. The Court further observed common evidence of the defendants' corporate practices and policies and the standard agreement governing the class members likewise "serve[d] to provide common proof of whether Defendants satisfy Prong A, which focuses on a putative employer's control. *Id.* at *21 (citing *Dynamex*, 4 Cal. 5th at 957).

Here, as in *Roman* and *Ludlow*, common questions predominate regarding whether Drivers perform work outside Defendant's usual course of business under Prong B of the ABC test. Moreover, as the court discussed in *Ludlow*, common questions likewise predominate regarding whether XPO exerts control over the Drivers in the performance of their work. Both questions can be answered by common evidence. Therefore, because satisfying the predominance requirement for just one of these prongs is sufficient to warrant class treatment, Plaintiff easily satisfies the requirements of Rule 23(b)(3) on the core misclassification question and certification should be granted. *See Dynamex*, 4 Cal. 5th at 966 ("Because each part of the ABC test may be independently determinative of the employee or independent

contractor question, our conclusion that there is a sufficient commonality of interest under part B of the ABC test is sufficient in itself to support the trial court's class certification order.").

**1.** *Whether XPO Satisfies Prong A of the ABC Test is a Common Question That is Subject to Common Proof*

As discussed above, Prong A of the ABC test requires Defendant to establish that Drivers are free from Defendant's control and direction "in the performance of the work, both under the contract for the performance of the work and in fact." *Dynamex*, 4 Cal. 5th at 958; *see Alexander v. FedEx Ground Package Sys.*, 765 F.3d 981, 988 (9th Cir. 2014) (noting that the central control inquiry "whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired") (citing *S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341, 350 (1989).

Here, whether XPO retains all necessary control over its Drivers in the performance of their work is a predominant question that can be answered according to common evidence. Because XPO subjects Drivers to common agreements and maintains uniformly applicable practices, whether XPO satisfies Prong A can be readily adjudicated in a single stroke by reference to these common agreements, policies, and practices, and by testimony from Defendant's high-level employees regarding these policies and practices in their application to the Drivers. *See Ludlow*, 2022 U.S. Dist. LEXIS 118092, at * 21 (observing that defendants' corporate practices and policies regarding class members and its agreements with class members describing the nature of their responsibilities and working relationship "serves as common proof of whether Defendants satisfy Prong A of the ABC Test").

An examination of this common evidence readily reveals that XPO retains all necessary control over the Drivers in the performance of their work. As discussed *supra*, XPO strictly controls its Drivers by controlling who it hires as a Delivery Driver, the terms on which Drivers work, retaining the right to permanently terminate the employment relationship at will and without cause, by requiring all Drivers to use Defendant's application and devices to carry out their duties, by imposing strict policies regarding Drivers' work performance, by giving Drivers extensive instruction and training in the exact manner that they must perform

their duties, by unilaterally setting the prices for the services they sell to its retail clients, and by controlling how they are compensated.  Thus, whether Drivers are free from Defendant's control in the performance of their work under Prong A of the ABC test presents a common question that is answerable by common proof, it is sufficient by itself to warrant certification of Plaintiff's misclassification claim. *See Ludlow*, 2022 U.S. Dist. LEXIS 118092, at *9-10 ("[A] class need only establish that a hiring entity failed one prong in order to prove its misclassification claim.").  The predominance inquiry is satisfied as to Prong A; the misclassification claim must be certified.

**2.** *Whether XPO Satisfies Prong B of the ABC Test is a Common Question That is Subject to Common Proof*

Prong B examines whether workers perform work outside the usual course of the hiring entity's business.  *Dynamex*, 4 Cal. 5th at 965-66; Cal. Lab. Code § 2775(b)(1). This inquiry generally turns upon common evidence regarding the work performed by class members and the hiring entity's business model. *See, e.g., Dynamex*, 4 Cal. 5th at 965-66 (because defendant was a delivery company and class members performed deliveries for defendant, whether they performed work outside the usual course of defendant's business was "clearly amenable to determination on a class basis."); *Vazquez*, 986 F.3d at 1125-26 (identifying defendant's characterization of itself as a cleaning business on its websites and advertisements relevant in determining its line of business); *Roman*, 342 F.R.D. at 295-96 (the predominance requirement was met as to Prong B since all class members performed the same work and defendant's line of business could be determined by reference to defendant's own statements regarding its line of business on its website and advertisements). Both the Ninth Circuit and the California Supreme Court have highlighted the ease with which Prong B can be used to resolve a case in a single stroke. *See Vazquez*, 986 F.3d at 1125 ("Prong B may be the most susceptible to summary judgment"); *Dynamex*, 4 Cal. 5th at 965 (finding it "quite clear that there is a sufficient commonality of interest" in answering whether class members work within the course of the employer's business).

Here, whether Drivers perform work that is within the usual course of XPO's business

poses a common question that is resolvable through common evidence. All Drivers perform the same work for XPO – fulfilling the contractual promise Defendant makes with its retail customers by having the Drivers perform the delivery of goods – and are subject to the same agreements and strict policies regarding the exact manner that they can and cannot perform their duties. *See Ludlow*, 2022 U.S. Dist. LEXIS 118092, at *20-21 (finding that the standard agreement signed by every class member "detail[ing] the workers' specific job requirements and responsibilities" could "be used to determine whether the [class member] is 'necessary' or merely 'incidental' to Defendants' usual course of business"). As the Ninth Circuit found in *Vazquez* and as a court in this district concluded in *Roman*, how XPO holds itself out to the public can be used to provide common evidence regarding its usual course of business. *Vazquez*, 986 F.3d at 1125-26; *Roman*, 342 F.R.D. at 295-96.

XPO statements made in its 10-K and 10-Q reports (Exh. 5, 24), to the Securities and Exchange Commission, to its investors, and general public, as well as the testimony of its Senior Vice President of Strategic Accounts regarding XPO's business model, its relationship with Drivers – underscored through the various documents produced (Exhs. 8, 21, 25) – provide common evidence establishing that Drivers not only perform work within the usual course of XPO's business, but are in fact the foundation upon which the entire business is based. Defendant cannot reasonably contend that their Drivers are performing work that is outside the usual course of their business and Plaintiff thus has satisfied the predominance requirement as to Prong B of the ABC test.

Accordingly, as common questions predominate over individualized issues under the ABC test as to Plaintiff's central misclassification claim, class certification should be granted.

**d.    *Common Questions Predominate as to Plaintiff's Wage and Hour Claims***

Once the core question of Drivers' proper classification is resolved, Class Members' ability to recover under the remaining Labor Code claims asserted in the operative complaint will be established for the entire class. *See Ludlow*, 2022 U.S. Dist. LEXIS 118092 at *22-26 (certifying all Labor Code claims that derived from defendants' misclassification of employees as independent contractors).

### 7. Indemnification of Expenses is a Common Question

Plaintiff alleges that Defendant violated California Labor Code §2802, which provides that "[a]n employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties []." Cal. Lab. Code § 2802(a). IWC Wage Order 9-2001, § 9(B) provides that "[w]hen tools or equipment are required by the employer or are necessary to the performance of a job, such tools and equipment shall be provided and maintained by the employer[]." The Federal and California courts routinely certify expense reimbursement classes similar to this.[12] XPO's policies for what is reimbursed and what is not are the same across the class. Thus, XPO's liability for this claim rests entirely on whether the drivers are "employees" entitled to reimbursement.  Additionally, because these deductions and fees are uniformly applied to the class through RXO's standardized "Self-Employment Business Ledgers" and "Administrative Services Addenda," the question of whether XPO unlawfully failed to reimburse necessary business expenses under California Labor Code § 2802 is inherently capable of class-wide resolution.

### 8. Unlawfully Deducted Drivers' Wages is a Common Question

Labor Code § 221 provides, "[i]t shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee." Wage Order 9-2001 § 8 states, "[n]o employer shall make any deduction from the wage or require any reimbursement from an employee for any cash shortage, breakage, or loss of equipment, unless it can be shown that the shortage, breakage, or loss is caused by a dishonest or willful act, or by gross negligence of the employee." *Jasper v. C.R. Eng., Inc.* (C.D. Cal. Aug. 30, 2012) 2012 U.S. Dist. LEXIS 186607, at *30-31.  XPO has a specific

[12] *See, e.g. Dilts v. Penske Logistics, LLC*, 267 F.R.D. 625, 639-40 (S.D. Cal. 2010) (appliance driver/installers); *Stuart v. Radioshack Corp.*, 2009 WL 281941, at *15 (N.D. Cal. Feb 5, 2009) reimbursement for vehicle expenses); *Cardinal Logistics*, 2008 WL 4156364, at *3, 12 (delivery drivers); *Estrada*, 154 Cal.App.4th at 13-14 (pick-up and delivery drivers); *cf. Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Ca1.4th 554, 576 (2007) (remanding for class certification determination after discussing methods of proving reimbursement for vehicle expenses).

22

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION – Case No. 3:22-CV-08976-SI

chargeback schedule demonstrating that it subjects all Drivers to the same categories of wage deductions. Whether these deductions are unlawful again depends on common questions that predominate over individual ones.  For these reasons, Plaintiff's deduction claim should be certified.

        9.     <u>Failure to Provide Meal & Rest Breaks is a Common Question</u>

Under IWC Wage Order 9-2001, §11, and Labor Code §§226.7, 512, employers must provide employees with a reasonable opportunity to take off-duty meal periods during which they are completely relieved of duty for at least 30 minutes by every 5 hours of work, and must not impede or discourage them from taking such breaks. *Brinker Restaurant Corp. v. Superior Court*, 53 Ca1.4th 1004, 1040 (2012). Employers must also "authorize and permit" ten minutes of rest for every four hours worked or "major fraction thereof." *Id* at 1028. "The onus is on the employer to clearly communicate the authorization and permission to its employees." *Bufil v. Dollar Financial Group, Inc.*, 162 Cal.App.4th 1193 (2008). Moreover, the failure to adopt and implement policies that notify the employees of their meal and rest period rights and provide them with a realistic opportunity to take off-duty meal and rest periods, is itself a violation of the meal and rest period laws.[13]  Where an employer misclassifies its workforce as independent contractors and consequently fails to adopt any compliant break policy, class certification is the superior mechanism for resolution. *Bradley v. Networkers Int'l*, LLC, 211 Cal. App. 4th 1129, 1150-51 (2012).

XPO has not implemented any policies or procedures to notify Drivers of their meal and rest period rights, or to provide them with a realistic opportunity to take them within the time windows of California law. On the contrary, XPO has taken the position that it is exempt from this requirement for all drivers – a common legal question in and of itself.  Moreover, the class members have attested to routinely needing to drive long hours without any off-duty

---

[13] *See Benton v. Telecom Network Specialists, Inc.*, 220 Cal.App.4th 701, 725 (2013) (certifying meal period claim based on alleged failure of employer to adopt a policy and implement procedures ensuring employees receive notice of and are able to exercise their meal period rights); *see also Frank v. Gold'n Plump Poultry, Inc.*, 2007 WL 2780504, *3 (D. Minn. 2007) (explaining that a "policy not to have a policy... is properly challenged through a class action.").

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION – Case No. 3:22-CV-08976-SI

meal or rest periods, or even a chance to eat or go to the bathroom outside the truck. If, as Plaintiff contends, the Drivers are employees rather than independent contractors, XPO's policies or lack thereof violate California law. *See Cicairos v. Summit Logistics, Inc.*, 133 Cal.App.4th 949, 962-63 (2005). Courts have not hesitated to certify meal break claims under similar circumstances. *See, e.g., Dilts*, 267 F.R.D. at 635-39.

10.    Failure to Pay All Wages Earned, Including Overtime, is a Common Question

"[A] piece-rate formula that does not compensate directly for all time worked does not comply with California Labor Codes, even if, averaged out, it would pay at least minimum wage for all hours worked." *Cardenas v. McLane Foodservices, Inc.*, 796 F. Supp. 2d 1246, 1252 (C.D. Cal. 2011); *see* Cal. Lab. Code § 226.2(a); *Gonzalez v. Downtown LA Motors, LP*, 215 Cal. App. 4th 36, 40-41 (2013); *Bluford v. Safeway Inc.*, 216 Cal. App. 4th 864, 872 (2013). Nonetheless, XPO's written compensation schedule specifically excludes any pay (even minimum wage) for "non-hauling" activities such as "routing and supervision, overhead, customer relations, order fulfillment, pre-notification, cross-dock operations, transportation management, intercompany transfer and warehouse operations, among other things..."  In addition, Drivers consistently report that they often did not make minimum wage because of all the deductions taken from their pay and expenses they had to cover out of their own pockets, a claim that can be confirmed by analysis of the written driver logs and compensation records XPO is required to maintain by law. Thus, common issues predominate on the minimum wage claim.  Additionally, Drivers routinely work over 12 hours a day and often work six or more days straight. Yet, XPO's standardized compensation schedules pay on a piece rate basis and do not include any premiums for overtime.

11.    The Remaining Claims Turn Upon Drivers' Classification Status

Once Drivers proper classification is determined, Plaintiff's derivative claims for Defendant's failure to pay all earned wages under Labor Code §§ 201 and 202, failure to provide accurate and itemized wage statements to Drivers pursuant to Labor Code § 226 and resulting liability for unfairly competing under Business and Professions Code § 17200, *et seq.*, are likewise established. *See Johnson v. Serenity Transp., Inc.*, 2018 U. S. Dist. LEXIS

24

129241, at *45 (N.D. Cal. 2018) ("If the drivers were employees and not independent contractors – a question the Court has already decided is subject to common proof- the wage statement and waiting time claims are also subject to common proof."); *James v. Uber Techs, Inc.*, 338 F.R.D. 123, 140 (N.D. Cal. 2021) ("[T]he predominance requirement is satisfied for Plaintiffs' itemized wage statement claims because it is also satisfied for the misclassification claim."); *Fleming v. Matco Tools Corp.*, 2021 U.S. Dist. LEXIS 33513, at *46 (N.D. Cal. Feb. 21, 2021) (certifying a UCL claim because it was derivative of Labor Code claims that were likewise certified).

e.    ***A Class Action is the Superior Mechanism for Addressing the Claims***

Class treatment is superior "whenever the actual interests of the parties can be served best by settling their differences in a single action."  *Hanlon*, 150 F.3d at 1022 (internal quotations omitted). In evaluating superiority, courts consider: (a) the class members' interests in individually controlling the prosecution of separate actions; (b) the extent and nature of any litigation concerning the controversy already begun by or against class members; (c) the desirability of concentrating the litigation of claims in the particular forum; and (d) the likely difficulties in managing a class action.  Fed. R. Civ. P. 23(b)(3)(A)-(D); *see Amchem Prods., Inc.*, 512 U.S. at 617 (the superiority requirement ultimately ensures the "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents to court at all."). These factors counsel in favor of certification here. Litigating the class claims in this action individually would not be in the Drivers' interests as it would be grossly inefficient, costly, and could ultimately lead to inconsistent results. This case is manageable as a class action since all class members have the same central claim against Defendant – they were misclassified as independent contractors under California law. Each underlying Labor Code claim is based on and can be proven by Defendant's own policies, practices, and testimony. Thus, Plaintiff has adequately demonstrated that a class action is the superior method for addressing his and other Drivers' claims.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Class Certification should be granted.

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION – Case No. 3:22-CV-08976-SI

Respectfully Submitted,

Dated: April 10, 2026

BOYAMIAN LAW, INC.
By: /s/ Michael H. Boyamian
    MICHAEL H. BOYAMIAN
    ARMAND R. KIZIRIAN
    Attorneys for Plaintiff Maynor Mejia
    Lopez and all others similarly situated

**Signature Attestation**

Pursuant to Civil Local Rule 5-1(i)(3), I attest that concurrence in the filing of this document has been obtained from Michael H. Boyamian of Boyamian Law, Inc.

DATED:  April 10, 2026          BOYAMIAN LAW, INC.


By: /s/ Armand R. Kizirian
    Armand R. Kizirian
    Attorneys for Plaintiff Maynor Mejia Lopez
    and all others similarly situated

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION – Case No. 3:22-CV-08976-SI